845 So.2d 625 (2003)
Odessa Hubbard HELD and Scott Held Individually and on Behalf of their Minor Son Jacob Held
v.
Dr. Clinton C. AUBERT.
No. 2002 CA 1486.
Court of Appeal of Louisiana, First Circuit.
May 9, 2003.
*628 Sumpter B. Davis, III, Christopher L. Whittington, Baton Rouge, for Plaintiffs-Appellees Odessa Hubbard Held and Scott Held Individually and on Behalf of Their Minor Son Jacob Held.
Janie Languirand Coles, Baton Rouge, for Defendant-Appellant Dr. Clinton C. Aubert.
Before: FITZSIMMONS, GUIDRY, and PETTIGREW, JJ.
PETTIGREW, J.
Following a jury trial in this medical malpractice action, a verdict was returned wherein it was determined that the defendant had breached the applicable standard of care in delivering plaintiff's baby and damages totaling $1,525,000.00 were awarded. The defendant subsequently filed a pleading entitled "Motions For Judgment Notwithstanding The Verdict, And, In The Alternative For A New Trial, And, In The Alternative, For A Remitittur," which were denied by the trial court. The defendant now appeals. For the reasons that follow, we reverse in part and affirm in part.

FACTS AND PROCEDURAL HISTORY
According to the record, this case involves a medical malpractice action instituted by plaintiffs, Odessa Hubbard Held and Scott Held, individually and as representatives of their minor child, Jacob Held ("baby Jacob"), against defendant, Dr. Clinton C. Aubert, the obstetrician who delivered baby Jacob. Plaintiffs contend that Dr. Aubert breached the applicable standard of care with respect to the treatment rendered to baby Jacob. The record reveals that baby Jacob was born on March 12, 1997, following a difficult vaginal delivery in which a vacuum extractor and forceps were used. Plaintiffs allege that as a result of the trauma associated with the delivery, baby Jacob sustained severe head trauma with multiple skull fractures, lacerations above the left eye, abrasions to both eyes, clouding over the left cornea, overlapping plates in the skull, and a shoulder injury. Plaintiffs further assert that because of the inappropriate use of forceps by Dr. Aubert, baby Jacob suffers from greatly diminished hearing and greatly diminished eyesight in his left eye.
Plaintiffs' suit for damages proceeded to a jury trial commencing on November 26, 2001; and on November 29, 2001, the jury returned a verdict finding that Dr. Aubert had breached the applicable standard of care, resulting in damages to baby Jacob and his parents. The jury awarded baby Jacob the following damages: physical injury $150,000.00; past, present, and future physical and mental pain and suffering $250,000.00; loss of enjoyment of life $200,000.00; permanent disability $275,000.00; and future medical expenses $250,000.00. The jury also awarded each *629 of baby Jacob's parents $100,000.00 for mental anguish and emotional distress from witnessing the injuries to their son and $100,000.00 for loss of consortium. The trial court signed a judgment in accordance with the jury's verdict on December 28, 2001.
Plaintiffs filed a motion to assess costs pursuant to La.Code Civ. P. art. 970, contending that they had extended an offer of judgment to Dr. Aubert on June 22, 2001, to settle their claims against Dr. Aubert for the sum of $100,000.00. Noting that their offer was never accepted by Dr. Aubert and that they obtained an award that was at least 25 percent greater than the amount of the offer of judgment, plaintiffs requested that $17,075.13 be assessed against Dr. Aubert as costs incurred by plaintiffs subsequent to June 22, 2001. Thereafter, Dr. Aubert filed a pleading entitled "Motions For Judgment Notwithstanding The Verdict, And, In The Alternative For A New Trial, And, In The Alternative, For A Remitittur." Following a hearing on March 11, 2002, the trial court rendered judgment on March 27, 2002, denying Dr. Aubert's motions, but granting plaintiffs' motion for costs, assessing costs in the amount of $10,090.15 against Dr. Aubert.[1]
Dr. Aubert has suspensively appealed the trial court's December 28, 2001 judgment, assigning the following specifications of error:
1. The trial court erred in allowing the verdict form to include an award of damages for Jacob Held's parents for their mental anguish and emotional distress from witnessing his injuries, as the issue was not raised prior to the completion of plaintiff's case, and they did not adduce facts to establish such an award.
2. The trial court erred in allowing the verdict form to include an award of damages for Jacob Held's parents for their mental anguish and emotional distress from witnessing his injuries, as they did not adduce facts to establish that they were contemporaneously aware that Jacob was being harmed at the time of the delivery as required by Louisiana Civil Code Article 2315.6 and the cases that have interpreted that law.
3. The trial court erred in allowing the verdict form to include an award of damages for Jacob Held's parents for their mental anguish and emotional distress from witnessing his injuries, as they did not adduce facts to establish that their mental anguish and emotional distress satisfied the requirements of Louisiana Civil Code Article 2315.6 and the cases that have interpreted that law.
4. The trial court erred in allowing the verdict form to include an award of damages for Jacob Held's parents for their mental anguish and emotional distress from witnessing his injuries, as no such claim was made, no legal support was submitted, and the jury was not instructed on Louisiana Civil Code Article 2315.6 and the cases that have interpreted that law.
5. It was legal error for the trial court to award costs against Appellant, a qualified health care provider under La.R.S. 40:1299.41 et seq.
6. The trial judge's order disallowing Appellant's expert witness, Dr. Timothy Johnson, from testifying at trial because Dr. Johnson's clinical and academic *630 schedule prevented him from appearing for a discovery deposition in Baton Rouge, during the trial, two days before his trial testimony, and denying Appellant's motion for a continuance was an abuse of discretion.
7. The amount of damages awarded to Jacob Held was excessive.

RECOVERY OF DAMAGES UNDER ARTICLE 2315.6 (Assignments of Error Numbers 1-4)
In their first four assignments of error, defendant contends the trial court erred in allowing the verdict form to include an award of damages to baby Jacob's parents for their mental anguish and emotional distress from witnessing his injuries, arguing that (1) the issue was not raised prior to the completion of plaintiffs' case, (2) there was no evidence that plaintiffs were contemporaneously aware that baby Jacob was being harmed at the time of delivery, (3) there was no evidence that the plaintiffs' mental anguish and emotional distress satisfied the requirements of La. Civ. Code art. 2315.6, and (4) no such claim was made, no legal support was submitted, and the jury was not instructed on Article 2315.6 and the cases interpreting same.
At the outset, we note that defendant's argument concerning the trial court's failure to instruct the jury on Article 2315.6 damages impacts our review of this issue. When questioned at oral arguments regarding the absence of a specific jury charge relating to Article 2315.6 damages, counsel for plaintiffs asserted that the court's charge to the jury concerning the award of general damages sufficiently covered this issue. We find no merit to this argument. According to our review of the record, the trial court did not include any reference to Article 2315.6 damages in its charges to the jury. While the court advised the jury they could award damages for mental pain and suffering, the court did not expound on this element of damages, nor did it advise the jury of the legal requirements of Article 2315.6 that must be satisfied before such damages can be awarded.
Louisiana Code of Civil Procedure article 1792(B) requires the trial court to instruct the jurors on the law applicable to the cause submitted to them, citing only correct applicable legal principles. Baxter v. Sonat Offshore Drilling Inc., 98-1054, pp. 5-6 (La.App. 1 Cir. 5/14/99), 734 So.2d 901, 906. In a jury trial, the judge has a duty to charge the jury as to the law applicable in a case and the correlative right and responsibility to require that the jury get only the correct law. It is the judge's responsibility to reduce the possibility of confusing the jury, and he or she may exercise the right to decide what law is applicable to prevent counsel from arguing law which the trial judge deems inappropriate. Gardner v. Griffin, 97-0379, p. 4 (La.App. 1 Cir. 4/8/98), 712 So.2d 583, 586.
In the instant case, the judge failed to charge the jury on the applicable law relative to Article 2315.6 damages. We find such action by the trial court constitutes legal error. Where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the reviewing court should make its own independent de novo review and assessment of the record. Campo v. Correa, 2001-2707, p. 10 (La.6/21/02), 828 So.2d 502, 510. Therefore, based on the legal error of the trial court, we review the issue of Article 2315.6 damages de novo.
A cause of action for the emotional distress and mental anguish suffered by a bystander who witnesses injury to another *631 person or comes upon the scene soon thereafter was recognized by the Louisiana Supreme Court in Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990). In response to the Lejeune decision, the legislature enacted La. Civ.Code art. 2315.6 in 1991 and codified the test for recovery that was pronounced in Lejeune. Wartelle v. Women's and Children's Hospital, Inc., 97-0744, pp. 12-13 (La.12/2/97), 704 So.2d 778, 785. Under Article 2315.6, there are four basic requirements to recover damages for mental anguish or emotional distress suffered as a result of another person's injury. The requirements are as follows: 1) the claimant must have a specifically enumerated relationship with the injured person; 2) the claimant must have viewed an event causing injury to the injured person or have come upon the scene of the event soon thereafter; 3) the harm to the injured person must have been severe enough that one could reasonably expect the observer to suffer serious mental distress; and 4) the claimant must suffer emotional distress that is "severe, debilitating, and foreseeable." Trahan v. McManus, 97-1224, p. 8, n. 6 (La.3/2/99), 728 So.2d 1273, 1278, n. 6.[2] Pursuant to the language of Article 2315.6, a child and parent are clearly among those persons with a sufficient relationship to enable recovery of Lejeune damages. Thus, our inquiry turns to whether there was an injury-causing event in which the plaintiffs were contemporaneously aware that the event had caused harm to baby Jacob, as required for recovery of Article 2315.6 damages.
In Trahan, supra, the defendant was an emergency room doctor who mistakenly read the wrong chart in assessing the condition of an automobile accident victim. Thus, the defendant failed to detect that the victim was in shock and was bleeding internally. The defendant discharged the victim in the presence of his mother, and the victim died shortly thereafter in the presence of both his mother and father. The mother and father sought Lejeune bystander damages arising out of the misdiagnosis and death of their son. In considering the elements of recovery for Lejeune damages, the Louisiana Supreme Court stated as follows:
[W]hen the event is a negligent omission by the tortfeasor, such as frequently occurs in medical malpractice cases, the applicability of Article 2315.6 becomes more problematic for recovery of damages for mental distress resulting from observing an injury-causing event or arriving on the scene of the injury soon after the event while the victim is still in the condition, caused by the event, that creates emotional distress in the observer.
A historical review of cases allowing recovery of bystander damages shows that bystander damages are intended to *632 provide a remedy when severe mental distress arises directly and immediately from the claimant's observing a traumatic injury-causing event to the direct victim. In order to recover, the claimant who observes the injury-causing event (or soon thereafter comes upon the scene of the injury) must be contemporaneously aware that the event has caused harm to the direct victim. The requirement of temporal proximity has always been at the root of allowing recovery for emotional distress caused by an injury to another, ... whether recovery is limited to one who actually witnessed a traumatic injury ... or whether recovery is extended to one coming soon upon the traumatic injury, as under the Louisiana rule. Recovery of damages for mental anguish has almost never been extended to one who observed the victim's suffering at a place other than where the injury-causing event occurred or at a time not closely connected to the event.
The requirements of Article 2315.6, when read together, suggest a need for temporal proximity between the tortious event, the victim's observable harm, and the plaintiff's mental distress arising from an awareness of the harm caused by the event. The Legislature apparently intended to allow recovery of bystander damages to compensate for the immediate shock of witnessing a traumatic event which caused the direct victim immediate harm that is severe and apparent, but not to compensate for the anguish and distress that normally accompany an injury to a loved one under all circumstances.
Trahan, 97-1224 at 10-12, 728 So.2d at 1279 (footnotes omitted).
The Trahan court went on to conclude that the defendant's failure to read the correct chart and to provide treatment to the patient based on the data on the chart, a negligence of omission, was not an injury-causing event in which the claimant was contemporaneously aware that the event had caused harm to the direct victim, as required for recovery of Article 2315.6 damages. Moreover, the court found that assuming the doctor's negligent discharge of the patient was an injury-causing event, that event was not a traumatic event likely to cause severe contemporaneous mental anguish to an observer, even though the ultimate consequences were tragic indeed. Without answering whether bystander damages would have been recoverable had the claimants been contemporaneously aware of the harm caused by the event, the court found that such contemporaneous awareness was not present. Trahan, 97-1224 at 12-14, 728 So.2d at 1280-81. In the instant case, unlike in Trahan, we find that the plaintiffs were contemporaneously aware of the harm caused by Dr. Aubert's negligent use of forceps in delivering baby Jacob.
Scott Held testified that he was present the entire time during baby Jacob's delivery. He indicated that everything in the labor room was "fairly relaxed" and "fairly normal." When his wife was moved to the delivery room, Scott noted that things were "very fast paced" and that his wife began pushing. He described Dr. Aubert as being "red in the face" and "sweating." Scott stated that he was aware that Dr. Aubert was utilizing the vacuum extractor to move baby Jacob down the birth canal and noted that at one point, he heard a popping noise when the suction broke. When asked if he visited with his wife and baby Jacob after the delivery, Scott responded yes and described the injuries that he noticed on his newborn son, noting that he "looked like he had been beat up, in a fight." The following colloquy occurred between Scott and his counsel concerning the extent of baby Jacob's injuries:

*633 A. He had cuts over his eye, under his eye, bruises all over his head, a big strawberry on the back of the head, the left eye practically closed. When he was delivered, I got to hold him briefly in the delivery room. I remember whenever I was holding him, he looked up at me and he opened one eye and not both eyes. He opened his right eye and looked at me.
Q. Were there any other injuries that you noticed?
A. Wasn't moving hiswhenever he grinned, he kind of grinned, but it wasn't a full smile. It was kind of a one-sided grimace. That's about it.
Q. Did you notice anything about the shape of his head?
A. He looked like a conehead.
Q. And describe to the jury what you mean by that.
A. It was kind of long and pointed. It wasn't like a normal round head. It was kind of long.
Q. What were your feelings?
A. Well, in one manner, I was extremely happy because that was my first son, but in another aspect, like I said, he looked like he was beat up. I didn't think my son was supposed to look like that.
Odessa Held's testimony concerning the delivery was consistent with that of her husband. However, Odessa was not allowed to see baby Jacob until the following day in the neonatal intensive care unit. Odessa recalled how baby Jacob looked the first time she saw him in the neonatal intensive care unit:
Q. When you saw Jacob, how did he appear to you?
A. I was shocked. I hadn't even gotten to hold my baby yet. Hewhen Jacob was born, I didn't even get to hold him. Scotty got to hold him for just a couple of minutes, and Scotty was, like, here by me, and he held him, and Jacob opened just his right eye, just a little bit, and he tried to smile. You know, and one side of his face moved. When I saw Jacob in NICU, he had tubes down his throat helping him to breathe. He had wires coming from everywhere. We still couldn't pick him up. We could touch him, but I couldn't pick him up. He his head was twice as long as another when I was trying to caress him, he wasn't moving the right side of his face. His left eye was just, God, swollen huge. I rubbed on the sides of his head, and it felt like, just lumpy. It wasI hate to describe it like this, but it was like a cantaloupe that had started going bad when it gets lumpy. That's what it made me think of. And he had cuts above his left eye. He had abrasions over his right eye. His eyes were black. He had bruises all over him. He had skull fractures. Just, I wanted so bad to pick him up, and at the same time I was afraid to touch him because I didn't want to hurt him.
The tortious event in this case was Dr. Aubert's negligent use of forceps in delivering baby Jacob, which resulted in various injuries to baby Jacob. Under the guidelines propounded in Trahan, we find that the negligent treatment by Dr. Aubert was an "injury-causing event in which the [plaintiffs were] contemporaneously aware that the event had caused harm to the direct victim, as required for recovery of Article 2315.6 damages." Trahan, 97-1224 at 12, 728 So.2d at 1280. Thus, our next inquiry becomes whether the fourth requirement for recovery under Article 2315.6; i.e., that the emotional distress suffered by the plaintiffs was severe, debilitating, and foreseeable, has been satisfied.
A review of the jurisprudence indicates that serious emotional distress may *634 be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case. A non-exhaustive list of serious emotional distress includes neuroses, psychoses, chronic depression, phobia, and shock. Norred v. Radisson Hotel Corporation, 95-0748, p. 6 (La.App. 1 Cir. 12/15/95), 665 So.2d 753, 756.
In the instant case, Scott testified that after baby Jacob was discharged from the hospital, his wife spent much of her time bringing baby Jacob to appointments with his various doctors. He described his wife as an "emotional wreck" as a result of the injuries sustained by baby Jacob and noted that he too suffered emotionally following this incident. Scott indicated that Odessa was "extremely stressed" and constantly working to organize her schedule around baby Jacob's doctors' appointments. Odessa testified that her entire life was consumed with tending to baby Jacob's medical needs. She added that she "no longer had the life that [she] was accustomed to." When asked how Scott was affected by baby Jacob's injuries, Odessa noted that while Scott was very supportive of her in her efforts to care for baby Jacob, he was also very stressed because he was not able to go with her and baby Jacob to the various appointments. Odessa stated that it had totally changed their lives.
Although there can be no dispute that it must have been quite traumatic for plaintiffs to see the injuries sustained by baby Jacob during his delivery and to manage the rigorous schedule required to meet baby Jacob's medical needs once he was discharged from the neonatal intensive care unit, the description offered by plaintiffs falls short of an emotional injury that is both severe and debilitating, and thus, this event does not fall within the scope of allowable recovery. Cf. McNeely v. Ford Motor Company, Inc., 98-2139 (La.App. 1 Cir. 12/28/99), 763 So.2d 659, writ denied, XXXX-XXXX (La.4/28/00), 760 So.2d 1182 (daughter was not entitled to Lejeune damages for mental anguish she suffered when she realized that her mother had been injured while attempting to exit a defective vehicle in a panic); Magee v. Pittman, 98-1164 (La.App. 1 Cir. 5/12/00), 761 So.2d 731, writ denied, XXXX-XXXX (La.9/22/00), 768 So.2d 602 (wife who witnessed husband die of a heart attack was not entitled to Lejeune damages); Nelson v. Ruston Longleaf Nurse Care Center, Inc., 32,718 (La.App. 2 Cir. 2/1/00), 751 So.2d 436, writ denied, XXXX-XXXX (La.4/28/00), 760 So.2d 1175 (daughter of nursing home resident did not suffer severe or debilitating mental anguish when she watched nurse unwrap her mother's foot and saw hole in the back of her mother's heel, and thus daughter was not entitled to Lejeune damages); Declouet v. Orleans Parish School Board, 96-2805 (La. App. 4 Cir. 6/3/98), 715 So.2d 69, writs denied, 98-2051 (La.11/13/98), 730 So.2d 450, 98-2054 (La.11/13/98), 730 So.2d 451, 98-2058 (La.11/13/98), 730 So.2d 935, 98-2079 (La.11/13/98), 730 So.2d 936 (appellate court reversed award of Lejeune damages where plaintiff experienced only aches, insomnia, bad dreams, and depression); Jones v. Hawkins, 29,914 (La.App. 2 Cir. 1/21/98), 708 So.2d 749, writs granted, 98-1288, 98-1259 (La.9/4/98), 723 So.2d 425, 959, amended in part, reversed in part, 98-1259, 98-1288 (La.3/19/99), 731 So.2d 216 (father failed to establish that coming to scene moments after six-year-old son was struck by automobile and seeing son lying unconscious on road caused father severe, debilitating, and foreseeable emotional distress, with respect to claim for Lejeune damages); Norred, supra (wife did not suffer mental anguish or emotional distress after finding her husband *635 had been the victim of a robbery; court of appeal reversed lower court award of Lejeune damages); Ledbetter v. Concord General Corporation, 26,643 (La.App. 2 Cir. 03/1/95), 651 So.2d 911, writ granted 95-0809 (La.5/12/95), 654 So.2d 341, amended in part, reversed in part on other grounds, 95-0809 (La.1/6/96), 665 So.2d 1166, reversed in part on grounds of insurance coverage, 95-0809 (La.4/18/96), 671 So.2d 915 (a young child who suffered nightmares and required counseling upon finding her grandmother after an assault did not sustain severe and debilitating mental anguish sufficient to justify Lejeune damages); Murphy v. K.D. Auger Trucking, Inc., 598 So.2d 443 (La.App. 2 Cir.1992), writ denied, 600 So.2d 685 (La. 1992) (daughter who found her father after he had been hit and killed by a truck was not awarded Lejeune damages). For examples of plaintiffs whose emotional injuries were severe and debilitating, see Blair v. Tynes, 621 So.2d 591 (La.1993) and LaCour v. Safeway Insurance Company, 96-61 (La.App. 3 Cir. 6/19/96), 676 So.2d 761, writ denied, 96-1859 (La.10/25/96), 681 So.2d 372.
There was no medical testimony or diagnosis in this case regarding any emotional distress sustained by the plaintiffs as a result of witnessing the injuries sustained by baby Jacob during his delivery.[3] Nor did the plaintiffs give any specific testimony regarding serious emotional problems they were experiencing as a result of this incident. Without any such evidence, we find that the mental anguish suffered by plaintiffs was not severe and debilitating as required by Article 2315.6 and the jurisprudence. Thus, while we are sympathetic to the experience suffered by plaintiffs, they are not entitled to an award for mental anguish under Article 2315.6. Accordingly, we reverse that portion of the trial court's judgment.

AWARD OF COSTS PURSUANT TO ARTICLE 970[4] (Assignment of Error Number 5)
Dr. Aubert argues on appeal that costs cannot be assessed against him because *636 pursuant to La. R.S. 40:1299.42 B(2), he is not liable for any amount in excess of $100,000.00 plus interest. Dr. Aubert contends that La.Code Civ. P. art. 970 conflicts with La. R.S. 40:1299.42 B and that the latter prevails as the more specific in nature. He further asserts that as set forth in La. R.S. 40:1299.42 B(1) and (3), costs shall be paid by the patient's compensation fund. Dr. Aubert contends that the application of La.Code Civ. P. art. 970 is problematic in medical malpractice suits because the patient's compensation fund is not a party to the suit at the time when an offer is made and, thus, does not have the right to accept an offer of settlement made to a health care provider who does not wish to settle the case. In response to Dr. Aubert's argument in this regard, plaintiffs argue that the legislative intent behind Article 970 is clear and unambiguous and must be given effect by the courts. Noting that the judgment awarded by the trial court against Dr. Aubert exceeded the offer of judgment by at least 25 percent, plaintiffs contend that Dr. Aubert must bear the cost of this litigation for refusing to consider settlement in good faith.
Initially, we note that the instant appeal taken by Dr. Aubert was from the trial court's December 28, 2001 judgment on the merits of the case. The judgment wherein the court awarded $10,090.15 in costs against Dr. Aubert was rendered on March 27, 2002. Dr. Aubert did not appeal this judgment, and the delays for same have passed. An appellant's failure to file a devolutive appeal timely is a jurisdictional defect, in that neither the court of appeal nor any other court has the jurisdictional power and authority to reverse, revise or modify a final judgment after the time for filing a devolutive appeal has elapsed. When an appellant fails to file a devolutive appeal from a final judgment timely, the judgment acquires the authority of the thing adjudged, and the court of appeal has no jurisdiction to alter that judgment. Lay v. Stalder, 99-0402, p. 5 (La.App. 1 Cir. 3/31/00), 757 So.2d 916, 919. Thus, the issue addressed by Dr. Aubert in this assignment of error is not properly before this court on appeal. Nonetheless, because there are very few reported cases analyzing the application of Article 970 and none involving the application of same in a medical malpractice action, we choose to discuss our conclusions with regard to the applicability of Article 970 to the facts of this case.
Article 970 essentially provides that costs shall be awarded to an offeror whose pre-trial offer is rejected and later exceeded, after trial, by a judgment at least 25 percent greater than the offer. Article 970 is punitive in nature and its function is to compensate the rejected offeror who is forced to incur greater trial litigation costs that could have been avoided if the offeree had not acted unreasonably in rejecting the offer. Edwards *637 v. Daugherty, 98-635, p. 10 (La. App. 3 Cir. 6/9/99), 736 So.2d 345, 351, writ denied, 99-2034 (La.9/17/99), 747 So.2d 568. Statutes that authorize the imposition of a penalty are to be strictly construed. Barringer Lands, Ltd. v. Barringer, 99-0139, p. 5 (La.App. 1 Cir. 5/12/00), 761 So.2d 720, 722.
With regard to the limitation of recovery in medical malpractice suits, Section B of La. R.S. 40:1299.42 provides as follows:
B. (1) The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost.
(2) A health care provider qualified under this Part is not liable for an amount in excess of one hundred thousand dollars plus interest thereon accruing after April 1, 1991, for all malpractice claims because of injuries to or death of any one patient.
(3)(a) Any amount due from a judgment or settlement or from a final award in an arbitration proceeding which is in excess of the total liability of all liable health care providers, as provided in Paragraph (2) of this Subsection, shall be paid from the patient's compensation fund pursuant to the provisions of R.S. 40:1299.44(C).
(b) The total amounts paid in accordance with Paragraphs (2) and (3) of this Subsection shall not exceed the limitation as provided in Paragraph (1) of this Subsection. [Emphasis added.]
In granting plaintiffs' motion to assess costs against Dr. Aubert, the trial court noted as follows:
Under 970 the specific language talks about assessing costs against the party who fails to settle. I don't see how you can visit costs on a party who fails to settle, because the [patient's compensation fund] wasn't a party at the time that this litigation was going on. But I think 970 is an exception to the Medical Malpractice Act; I think 970 is an encouragement to both plaintiffs and defendants to settle their cases. And if they don't, they are liable in costs. It wouldn't make any sense to do it otherwise. Therefore, I'm going to assess the costs against the defendant, Dr. Aubert, in this case. And I'm going to assess I'm going to reduce Dr. O'Leary's fee to five thousand dollars. I don't know what that medicalthe travel expenses are, but I'm going to discount that because I don't have the specificwhat that expense is for. But in all other respects I'm going to assess the costs against Dr. Aubert.
We agree with the trial court that Article 970 is an exception to La. R.S. 40:1299.42 and is applicable to this case such that Dr. Aubert can be held personally liable for the costs awarded pursuant to Article 970.
The starting point for interpretation of any statute is the language of the statute itself. Fontenot v. Reddell Vidrine Water District, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX, p. 7 (La.1/14/03), 836 So.2d 14, 20. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. La. Civ.Code art. 9. See also La. R.S. 1:4. Citing Bunch v. Town of St. Francisville, 446 So.2d 1357, 1360 (La. App. 1 Cir.1984), this court recently addressed the statutory and jurisprudential rule for statutory interpretation in Ransome v. Ransome, 2001-2361 (La.App. 1 Cir. 6/21/02), 822 So.2d 746 as follows:

*638 When a law or ordinance is clear and free from all ambiguity, it must be given effect as written.
When interpreting a law (ordinance), the court should give it the meaning the lawmaker intended. It is presumed that every word, sentence or provision in the law was intended to serve some useful purpose, that some effect is to be given to each such provision, and that no unnecessary words or provisions were used. Conversely, it will not be presumed that the lawmaker inserted idle, meaningless or superfluous language in the law or that it intended for any part or provision of the law to be meaningless, redundant or useless. The lawmaker is presumed to have enacted each law with deliberation and with full knowledge of all existing laws on the same subject. The meaning and intent of a law is to be determined by a consideration of the law in its entirety and all other laws on the same subject matter, and a construction should be placed on the provision in question which is consistent with the express terms of the law and with the obvious intent of the lawmaker in enacting it. Where it is possible to do so, it is the duty of the courts in the interpretation of laws to adopt a construction of the provision in question which harmonizes and reconciles it with other provisions. A construction of a law which creates an inconsistency should be avoided when a reasonable interpretation can be adopted which will not do violence to the plain words of the law and will carry out the intention of the lawmaker.
Ransome, 2001-2361 at 5-6, 822 So.2d 746, 752.
The language of Article 970 is unambiguous and must be construed according to its plain meaning. Dr. Aubert contends that he cannot be held liable for anything above the statutorily imposed cap of $100,000.00 plus interest that is provided for in La. R.S. 40:1299.42. If we were to accept this argument, we would be undermining the clear intent and spirit of the legislature in enacting Article 970, i.e., encouraging reasonable settlements before trial and compensating the rejected offeror who is forced to incur greater litigation costs that could have been avoided if the offeree had not acted unreasonably in rejecting the offer. Statutory interpretations that lead to absurd results are impermissible. Palmer v. Louisiana Forestry Commission, 97-0244, p. 11 (La.10/21/97), 701 So.2d 1300, 1306. Based on our review of the applicable law and jurisprudence and the unambiguously expressed intent of the legislature in enacting Article 970, we conclude that the provisions of Article 970 must be given effect, as intended by the legislature, to assess "offeror's costs" against Dr. Aubert in the instant case. We note that Article 970 does not define "offeror's costs." However, if the legislature had intended to assess only court costs against an offeree who acts unreasonably in rejecting an offer thereby causing the offeror to incur greater trial litigation costs, Article 970 would have provided as such In our opinion, "offeror's costs," as it is used in Article 970, refers to the costs of litigation, which includes court costs. Thus, we find no error by the trial court in concluding that Article 970 is applicable to medical malpractice suits and awarding costs accordingly.

LAW OF THE CASE DOCTRINE (Assignment of Error Number 6)
From early on in this litigation, plaintiffs sought to discover the identity of all experts to be called at trial by the defense. On July 13, 2000, the defense provided answers to interrogatories wherein it was noted that only the members *639 of the medical review panel and Dr. Aubert would be called as expert witnesses. Thereafter, on September 21, 2001, the defense supplemented these answers to discovery, naming, for the first time, Dr. Timothy Johnson, as an expert witness for the defense. The trial date had already been set for the week of November 26, 2001. According to the record, plaintiffs attempted to schedule a discovery deposition of Dr. Johnson, but were unable to coordinate a time that was acceptable to all the parties. Subsequently, on October 12, 2001, plaintiffs filed a motion in limine to exclude Dr. Johnson as a witness. The trial court denied the motion in limine on November 13, 2001, but ordered that Dr. Johnson be made available for a discovery deposition. Due to scheduling conflicts, this deposition never took place. Thereafter, the parties met with the court on November 14, 2001, at which time the court ordered that Dr. Johnson appear on November 27, 2001, for the discovery deposition.
When the parties appeared in court for the first day of trial on November 26, 2001, the court was notified that Dr. Johnson was not going to be present on the following day for his deposition, as had been previously ordered by the court. At that time, Dr. Aubert's counsel filed a motion to allow Dr. Johnson's expert testimony, or in the alternative, a motion for a continuance. After hearing argument from the parties, the trial court denied the motion. The defense then filed a writ application with this court, which was subsequently denied.
As is obvious from the fact that a panel of this court previously addressed this issue in denying Dr. Aubert's writ application, we consider whether it is appropriate to address this assignment of error or whether review is affected by the "law of the case doctrine." In Louisiana Land and Exploration Company v. Verdin, 95-2579 (La.App. 1 Cir. 9/27/96), 681 So.2d 63, writ denied, 96-2629 (La.12/13/96), 692 So.2d 1067, cert. denied, 520 U.S. 1212, 117 S.Ct. 1696, 137 L.Ed.2d 822 (1997), this court discussed the "law of the case doctrine" and its application as follows:
The law of the case principle is a discretionary guide which relates to (a) the binding force of a trial judge's ruling during the later stages of trial, (b) the conclusive effects of appellate rulings at trial on remand, and (c) the rule that an appellate court ordinarily will not reconsider its own rulings of law on a subsequent appeal in the same case. It applies to all prior rulings or decisions of an appellate court or the supreme court in the same case, not merely those arising from the full appeal process. Reargument in the same case of a previously decided point will be barred where there is simply a doubt as to the correctness of the earlier ruling. However, the law of the case principle is not applied in cases of palpable error or where, if the law of the case were applied, manifest injustice would occur.
The reasons for the "law of the case" doctrine is to avoid relitigation of the same issue; to promote consistency of result in the same litigation; and to promote efficiency and fairness to both parties by affording a single opportunity for the argument and decision of the matter at issue.
When an appellate court considers arguments made in supervisory writ applications or responses to such applications, the court's disposition on the issue considered usually becomes the law of the case, foreclosing relitigation of that issue either at the trial court on remand or in the appellate court on a later appeal. However, where a prior disposition is clearly erroneous and will create *640 a grave injustice, it should be reconsidered.
Louisiana Land and Exploration Company, 95-2579 at 3-4, 681 So.2d at 65 (citations omitted).
In considering this doctrine and its applicability herein, we note that Dr. Aubert's argument in this regard is indistinguishable from that presented to the trial court on the original motion and again to this court in the writ application. In fact, comparison of the discussion under this assignment of error and that in the memorandum filed with the trial court in support of the motion reveals the same argument and same citation to articles, statutes, and case law. Although ably argued, a review of the instant record reveals that the trial court's denial of the motion to allow Dr. Johnson's expert testimony, or in the alternative, for a continuance, and this court's subsequent review of same is without error. Thus, by operation of the law of the case doctrine, we decline review of this issue on appeal.

DAMAGE AWARD (Assignment of Error Number 7)
It is well settled that the trier of fact is afforded much discretion in awarding general damages. La. Civ.Code art. 2324.1. The standard for appellate review of general damages is set forth in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), wherein the Louisiana Supreme Court stated that "the discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages." The appellate court's initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Youn, 623 So.2d at 1260. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn, 623 So.2d at 1261. The role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Millican v. Ponds, 99-1052, p. 6 (La.App. 1 Cir. 6/23/00), 762 So.2d 1188, 1192.
After a thorough review of the record, we cannot say that the award in this case is so high that it constitutes an abuse of the vast discretion accorded to the trier of fact. The record reflects that baby Jacob sustained multiple injuries following a very difficult delivery in which forceps were misapplied. According to the discharge summary introduced into evidence and Dr. Aubert's own testimony, baby Jacob's injuries at the time of his discharge from the hospital on March 25, 1997, were as follows:
 Apnea secondary to intracranial hemorrhage, resolved.
 Skull fracture.
 Right parietal epidural hemorrhage and infratentorial subdural hemorrhage.
 Bilateral cephalhematomas, resolved.
 Left corneal edema.
 Right facial palsy, resolved.
 Left Erb's palsy, resolved.
 Group B strep sepsis, resolved.
 Hyperbilirubinemia, resolved.
 Atrial septal defect.
 Inspiratory stirdor.
When asked about the injuries that baby Jacob sustained during delivery, the following *641 colloquy occurred between Dr. Aubert and counsel for the plaintiffs:
Q. Suffice it to say, the kid was pretty beat up after this.
A. He indeed was.
Q. And further suffice it to say there can be no doubt that those injuries were caused by these forceps or the forceps that you used.
A. Either that or vacuum.
Q. And you used the vacuum also?
A. Yeah. We used both.
Moreover, when questioned about the positioning of the forceps, Dr. Aubert testified that "they had to be where they shouldn't have been" in the instant case to inflict these various injuries on baby Jacob.
Other health care providers who treated baby Jacob also testified concerning the extent of his injuries. Dr. Susan Bankston, a pediatrician who treated baby Jacob from June 5, 1997, until the time the family moved to Missouri, in February 2000, testified that during the course of her treatment of baby Jacob, she was either treating or evaluating him for the following injuries: (1) skull fracture and misshapen head; (2) conductive hearing loss that was probably caused from the skull fracture; (3) corneal abrasion; (4) hearing loss in the right ear; (5) Erb's palsy; (6) various cephalhematomas that are usually trauma related; (7) epidural and subdural hematomas related to the forceps injury; and (8) speech defects. Dr. Bankston indicated that baby Jacob's forceps delivery was the worse forceps injury she had ever seen.
With regard to baby Jacob's eye injury, Dr. Stephen Sessums, a pediatric ophthalmologist, described the various procedures baby Jacob had to endure. Dr. Sessums indicated that as a result of the forceps injury during delivery, baby Jacob had a hazy cornea in his left eye. He referred baby Jacob to Dr. David Dragon who performed a penetrating keratoplasy, a procedure whereby the cloudy cornea was cut off and replaced with a donor cornea. Baby Jacob was only two months old at the time of this surgery. After the cornea transplant, baby Jacob developed a cataract in the same eye. Dr. Sessums explained that this condition was most likely caused by steroid eye drops that were used following the transplant to prevent rejection of the donor cornea. Thereafter, Dr. Sessums performed a cataract surgery, removing the lens from baby Jacob's left eye.
Dr. Sessums testified further that baby Jacob has a condition called amblyopia in his left eye, which he described as a lack of connections between the eye and the brain. Noting that they had tried patching the right eye to help strengthen the vision in the left eye, Dr. Sessums indicated that baby Jacob's visual acuity in his left eye was "finger count at three feet." Dr. Sessums explained that this means that with his left eye, baby Jacob can see fingers from about three feet away, but can see nothing on the traditional eye chart. Dr. Sessums continued, noting that baby Jacob will probably never see any better than he does now, even with the use of glasses or contact lenses, and that even a surgical procedure to place an artificial lens in the left eye may not produce beneficial results. In a 1998 letter regarding baby Jacob's disability status. Dr. Sessums noted as follows:
This child has had a corneal transplant and cataract surgery all on the left eye as a result of birth trauma. His vision is poor in this eye. He is nonverbal but I would guesstimate that he sees no better than 20 / 200 in the left eye. His right eye is normal. We are continuing to do amblyopia therapy on this patient to improve his vision as much as possible. *642 He still will never have [normal] vision in the eye. He should be considered a one-eyed person. As long as his right eye remains normal, he should do well in school. There will be some occupations that will be closed to him.
As previously indicated, after hearing the testimony and considering the documentary evidence, the jury awarded $1,125,000.00 in damages to baby Jacob as follows: physical injury $150,000.00; past, present, and future physical and mental pain and suffering $250,000.00; loss of enjoyment of life $200,000.00; permanent disability $275,000.00; and future medical expenses $250,000.00. Based upon our review of the record in this matter, we decline to disturb this award. In view of the injuries baby Jacob sustained, we cannot say that the damage award constituted an abuse of discretion. This assignment of error regarding damages is without merit.

CONCLUSION
For the above and foregoing reasons, the judgment of the trial court awarding Article 2315.6 damages to plaintiffs is reversed. In all other respects, the judgment is affirmed. All costs associated with this appeal are assessed against defendant-appellant, Dr. Clinton C. Aubert.
REVERSED IN PART, AFFIRMED IN PART.
FITZSIMMONS, J., concurs in part and assigns additional reasons.
FITZSIMMONS, J., concurring in part, with additional reasons.
I respectfully concur, in part, and write to assign additional reasons.
Judgments for costs do not determine the rights of the parties or merits of the case from which they arose. Thus, a judgment for costs and fees rendered before the final judgment on the merits may be an interlocutory judgment. See La. C.C.P. art. 1841. Prior interlocutory judgments can be considered on the appeal of the merits judgment. Jarrell v. Carter, 577 So.2d 120, 124 (La.App. 1 Cir.), writ denied, 582 So.2d 1311 (La.1991). However, when the motion and judgment for costs is rendered after the final judgment on the merits, the costs judgment is a separate final appealable judgment. Hoyt v. State Farm Mutual Automobile Insurance Company, 623 So.2d 651, 663-64 (La. App. 1 Cir.), writ denied, 629 So.2d 1179 (La.1993); Borenstein v. Joseph Fein Caterers, Inc., 240 So.2d 584 (La.App. 4 Cir. 1970). Additionally, I note that the trial court retains jurisdiction to set and tax costs even after an order of appeal on the merits judgment has been granted. La. C.C.P. art.2088(10).
In this case, the motion for costs under Louisiana Code of Civil Procedure article 970 was filed after the jury verdict, but before the trial court signed the merits judgment implementing the verdict. After the merits judgment was signed, a separate hearing on the article 970 costs issue was held, and a separate judgment for costs was rendered. After considering the particular facts here and the applicable legal precepts, I agree that the judgment awarding article 970 costs was a separate final judgment that was not appealed.
Although our analysis of Code of Civil Procedure article 970 is dicta, it is an established precept that medical malpractice cases are not automatically exempt from application of other Louisiana laws, including articles of our Code of Civil Procedure and Civil Code. See Dumas v. State, Department of Culture, Recreation & Tourism, XXXX-XXXX (La.10/15/02), 828 So.2d 530. If the scope of a law is not clearly stated, interpretation of the law is essentially a search for the legislative intent. Fontenot v. Reddell Vidrine Water *643 District, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX, p. 7 (La.1/14/03), 836 So.2d 14, 20.
Under Louisiana Revised Statutes 40:1299.42 B, recovery of damages for injuries or death of a patient is limited. Specifically, Louisiana Revised Statutes 40:1299.42 B(1) limits general recovery to $500,000.00 for injuries or death, plus interest and costs. A qualified health care provider is not liable for damages from injuries or death in excess of $100,000.00, plus the interest arising from those awards. La. R.S. 40:1299.42 B(2). Any amount due that is in excess of the liability provided in B(2) is to be paid by the patient's compensation fund. La. R.S. 40:1299.42 B(3)(a). Thus, the fund is liable for damages awarded for injuries or death in excess of $100,000.00, plus interest.
Considering the scope of Code of Procedure article 970, and believing that the intent of the legislature in passing Revised Statutes 40:1299.42 was to limit damages from injuries and death, I find that amounts awarded for costs are not included in the damages or amounts to be limited or paid by the fund. Costs, by definition, cannot be excess amounts of damages from injuries or death to be paid by the fund. Thus, liability for costs must be ascertained by reference to other applicable law.
Code of Civil Procedure articles 1920 and 970 determine how costs are to be assessed depending on the specific facts. "Costs," traditionally known as "court costs," and "litigation costs" are two different species of the same genre. However, the latter has the bigger "sting." It is the latter that article 970 assesses. In this case, the costs assessed under article 970 are to be borne by the offeree who rejected the offer.[1] Therefore, in my opinion, Dr. Aubert, not the fund, is liable for plaintiffs' costs "incurred after the offer was made, as fixed by the trial court." La. C.C.P. art. 970 C.
Finally, even if this court's denial of the defense's writ did not become the law of the case, I agree with the result. I see no abuse of discretion in the trial court's denial, during the trial, of defense's motion to allow a medical expert to testify or for a continuance. La. C.C.P. art. 1632.
NOTES
[1] According to the record, the trial court reduced the costs submitted for the testimony of plaintiffs' expert from $11,660.98 to $5,000.00 and also excluded a $324.00 American Express bill for travel expenses dated October 26, 2001, thus accounting for the difference between the original amount prayed for by plaintiffs and the amount actually awarded by the court.
[2] Article 2315.6 provides, in pertinent part, as follows:

A. The following persons who view an event causing injury to another person, or who come upon the scene of the event soon thereafter, may recover damages for mental anguish or emotional distress that they suffer as a result of the other person's injury:
. . . .
(2) The father and mother of the injured person, or either of them.
. . . .
B. To recover for mental anguish or emotional distress under this Article, the injured person must suffer such harm that one can reasonably expect a person in the claimant's position to suffer serious mental anguish or emotional distress from the experience, and the claimant's mental anguish or emotional distress must be severe, debilitating, and foreseeable. Damages suffered as a result of mental anguish or emotional distress for injury to another shall be recovered only in accordance with this Article.
[3] We note this as a fact to be considered, as we are aware that awards for Lejeune damages have been upheld by appellate courts where there was no diagnosis or other clinical proof of a psychiatric disorder. See Blair, 621 So.2d at 601.
[4] Article 970 provides as follows:

A. At any time more than thirty days before the time specified for the trial of the matter, without any admission of liability, any party may serve upon an adverse party an offer of judgment for the purpose of settling all of the claims between them. The offer of judgment shall be in writing and state that it is made under this Article; specify the total amount of money of the settlement offer; and specify whether that amount is inclusive or exclusive of costs, interest, attorney fees, and any other amount which may be awarded pursuant to statute or rule. Unless accepted, an offer of judgment shall remain confidential between the offeror and offeree. If the adverse party, within ten days after service, serves written notice that the offer is accepted, either party may move for judgment on the offer. The court shall grant such judgment on the motion of either party.
B. An offer of judgment not accepted shall be deemed withdrawn and evidence of an offer of judgment shall not be admissible except in a proceeding to determine costs pursuant to this Article.
C. If the final judgment obtained by the plaintiff-offeree is at least twenty-five percent less than the amount of the offer of judgment made by the defendant-offeror or if the final judgment obtained against the defendant-offeree is at least twenty-five percent greater than the amount of the offer of judgment made by the plaintiff-offeror, the offeree must pay the offeror's costs, exclusive of attorney fees, incurred after the offer was made, as fixed by the court.
D. The fact that an offer is made but not accepted does not preclude a subsequent offer or a counter offer. When the liability of one party to another has been determined by verdict, order, or judgment, but the amount or extent of the damages remains to be determined by future proceedings, either party may make an offer of judgment, which shall have the same effect as an offer made before trial if it is served within a reasonable time not less than thirty days before the start of hearings to determine the amount or extent of damages.
E. For purposes of comparing the amount of money offered in the offer of judgment to the final judgment obtained, which judgment shall take into account any additur or remittitur, the final judgment obtained shall not include any amounts attributable to costs, interest, or attorney fees, or to any other amount which may be awarded pursuant to statute or rule, unless such amount was expressly included in the offer.
F. A judgment granted on a motion for judgment on an offer of judgment is a final judgment when signed by the judge; however, an appeal cannot be taken by a party who has consented to the judgment.
[1] Dr. Aubert did not raise the issue of whether the settlement offer complied with the requirements of Louisiana Code of Civil Procedure article 970 A. Thus, it is assumed that the prerequisites to assessment of costs under article 970 were met.