676 So.2d 1180 (1996)
Robert LEATHERMAN
v.
RIVERSIDE VILLAGE, a Partnership in Commendam and State Farm Fire and Casualty Company.
No. 95 CA 2227.
Court of Appeal of Louisiana, First Circuit.
June 28, 1996.
*1181 Walton J. Barnes, II, Carol J. Greenfield, Baton Rouge, for Robert Leatherman.
William F. Janney, Baton Rouge, for Riverside Village Apartments, and State Farm Fire and Casualty Company.
Before LOTTINGER, C.J., and GONZALES and FITZSIMMONS, JJ.
GONZALES, Judge.
This case involves an appeal contesting a jury's comparative fault and quantum assessments in a tort suit filed by a lessee (Robert *1182 Leatherman) against his lessor (Riverside Village, A partnership in Commendam) and its insurer (State Farm Fire and Casualty Company). Appellants, Riverside Village, A Partnership in Commendam, and State Farm Fire and Casualty Company, (collectively referred to as "Riverside"), complain that an assessment of only 15% fault on appellee, Robert Leatherman ("Leatherman") was manifestly erroneous. Additionally, they contend that a general damage award of $49,000 was a clear abuse of the jury's discretion.

FACTUAL BACKGROUND
Leatherman became a paraplegic as the result of a motorcycle accident in 1983. As a result of his paraplegia, he underwent extensive re-training with respect to 90% of the aspects of his life. This re-training lasted between six months and one year and extensively covered the topic of the dangers of hot water. While Leatherman's hands were not paralyzed, he suffered from a sensory deficit in his hands that prevented him from determining temperature with his hands.
In December 1991, Leatherman secured a lease at Riverside because it had handicap accessible apartment units and facilities. While Riverside was aware that Leatherman was a paraplegic, Leatherman never informed Riverside's management about his inability to decipher hot from cold with his hands. During the three to four months before the subject incident occurred, Leatherman routinely showered twice daily. His routine when taking a shower consisted of first turning on the cold water and then barely cracking on the hot water. The next step entailed turning on the shower and adjusting the water temperature using his face to detect when a comfortable temperature had been reached. Upon completion of his shower, he would normally turn off the shower first, followed by turning off the hot water and finally, the cold water. However, Leatherman admitted that he sometimes forgot to turn off the shower first.
On April 6, 1992, Leatherman was taking a shower in his apartment. He believes that he turned the shower off before proceeding to turn off the hot and then cold water. Leatherman testified that he completely turned off both water sources; however, he admitted the possibility that the water was not completely turned off. It is uncontradicted that after Leatherman completed his action of presumably turning off the hot and cold water, a small stream of hot water continued to fall from the faucet onto Leatherman's left foot which was situated under the faucet. This stream continued to fall on his left foot for up to 30 seconds, at which time Leatherman noticed a spasm in his foot and realized that hot water was falling on his foot. Instinctively, he turned both the hot and cold water faucets off again and the stream of water ceased to flow. However, as a result of his foot's exposure to the hot water, Leatherman sustained a third degree burn to his foot.
Leatherman first sought treatment for the burn with his internist on the morning after the incident. The internist referred him to the burn unit at the Baton Rouge General Hospital where he was treated by Dr. Andrew G. Hargroder. The treatment continued on an out-patient basis for three to four days. About one week after the incident, the burn area became infected; thus, Leatherman was hospitalized for treatment. The burn was of a sufficient degree and size to render a skin graft necessary. Accordingly, a skin graft was performed using skin from his upper left thigh. He remained in the hospital for five days after the surgery. He last saw Dr. Hargroder at the end of May 1992.
Leatherman admits that he did not physically suffer from the burn because he had no feeling in his foot. However, he testified that he was sad and angry that the incident occurred and he did not like the way the scar looked.
Leatherman filed suit against Riverside on March 24, 1993, alleging strict liability and negligence as the bases of fault. After a jury trial, the jury found that Riverside was negligent and assessed it with 85% fault for the incident and resulting damages sustained by Leatherman. It assessed Leatherman with 15% comparative fault. Finally, it awarded $49,000 in general damages, consisting of $10,000 for disfigurement and $39,000 for *1183 mental pain and suffering. A judgment was signed on February 27, 1995, setting forth the jury's findings. Riverside filed a Motion for Judgment Notwithstanding the Verdict and/or New Trial, Remittitur which was denied by the trial court. It is from the February 27, 1995 judgment that Riverside appeals, asserting the following assignments of error:
I. The jury committed manifest and reversible error by assigning only 15% fault to Robert Leatherman.
II. The jury abused its discretion in awarding Robert Leatherman $49,000.00 in general damages.

ASSIGNMENT OF ERROR NO. 1
Through this assignment of error, Riverside seeks a change in the jury's allocation of comparative fault. In Clement v. Frey, 95-1119, 95-1163 (La.1/16/96); 666 So.2d 607, 609, the Louisiana Supreme Court recently confirmed that the review of an allocation of comparative fault is governed by the standard set forth in Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976). In reaching this confirmation, the court concluded that the assessment of percentages of fault is also a factual determination. Clement, 666 So.2d at 610. Thus, we are mindful of the applicable principles that govern appellate review of a jury's assessment of percentages of fault which include that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
The ultimate determination by an appellate court as to whether a given judge or jury abused their "much discretion" as a matter of law is a judgment call. Clement, 666 So.2d at 609. Only after making the finding that the record supports that the lower court was clearly wrong in its apportionment of fault can the appellate court disturb the award, and then only to the extent of lowering it or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. Clement, 666 So.2d at 611.
In the present case, we find that the trial court's assessment of only 15% fault to Leatherman was clearly wrong.
The trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed. In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff and considerations in determining the relative fault of the parties. Clement, 666 So.2d at 611, citing Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2d 967, 974 (La.1985). Our supreme court in Clement stated that "[t]hese same factors guide [the] decision as to the highest percentage the court could reasonably assess the [defendant] and, correspondingly, the lowest percentage it could reasonably assess to [the plaintiff]. Clement, 666 So.2d at 611.
In applying these factors to the case under consideration, we conclude Leatherman was at least 30% at fault. While Leatherman contended that the stream of water was the result of a back flow, he testified that it was possible that he did not completely turn off the water. Leatherman's admission that the stream of water stopped after he turned the hot and cold water knobs off the second time provides further support that this possibility was in fact, a probability. There was no evidence in the record to explain the back flow of water theory or how it was possible. Additionally, we note that *1184 there was no evidence of a defect in the faucet, shower or water heater. In fact, the jury expressly found in its jury verdict form that the premises were not subject to a vice or defect. Thus, the jury must not have accepted the back flow of water theory, leaving the only logical explanation for how the water continued to flow being that the hot water was not completely turned off at the conclusion of Leatherman's shower.
In light of these facts, if the jury ignored the possibility/probability that Leatherman failed to completely turn off the water, it was clearly wrong and an assessment of only 15% fault to Leatherman was an abuse of discretion. Moreover, if the jury considered this possibility/probability, its assessment of only 15% fault to Leatherman was a clear abuse of its vast discretion. As Leatherman was the sole party in control of turning off the water, and the party in the best position to prevent this accident, the lowest possible percentage of fault that could have been allocated to him is 30%. Additionally, we note that under the present facts, a jury could reasonably have found that Leatherman was up to 90% at fault in causing the subject incident.[1] Consequently, we increase Leatherman's fault from 15% to 30%, which is the lowest amount the trial court could have reasonably allocated to Leatherman.

ASSIGNMENT OF ERROR NO. 2
Through this assignment of error, Riverside seeks a decrease in the jury's general damage award. In appellate review of general damage awards, the court must accord much discretion to the trial court judge or jury. Andrus v. State Farm Mutual Automobile Insurance Company, 95-0801, (La.3/22/96); 670 So.2d 1206, 1210; Reck v. Stevens, 373 So.2d 498, 501 (La.1979). The role of an appellate court in reviewing awards of general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trial court. Andrus, 670 So.2d at 1210; Reck, 373 So.2d 498, 500 (La.1979). Only if the reviewing court determines that the trial court has abused its "much discretion" may it refer to prior awards in similar cases and then only to determine the highest or lowest point of an award within that discretion. Andrus, 670 So.2d at 1210; Coco v. Winston Industries, Inc., 341 So.2d at 335.
Because discretion vested in the trial court is "great," and even vast, an appellate court should rarely disturb an award of general damages. Andrus, 670 So.2d at 1210; Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Andrus, 670 So.2d at 1210; Youn, 623 So.2d at 1261. This rationale applies to appeals by defendants as well as to appeals by plaintiffs. Andrus, 670 So.2d at 1210.
In the present case, we cannot find that the trial court's general damage award was an abuse of discretion. The record supports a finding that Leatherman was sad and angry over the incident, although he did not sustain any physical pain and suffering. It initially caused him to make daily visits to the burn care facility. He also sustained an infection which led to an extended hospital stay and surgery. Post-surgery, he had to wear a support stocking for nearly one year. He suffered a breakdown in the skin on his foot from which he had not suffered prior to the subject incident.
Moreover, we have considered and we reject Riverside's argument that scars that are not noticeable in public circumstances are not compensable. Riverside contends that because *1185 Leatherman's scars are covered by his pants and shoes, it was a clear abuse of the jury's discretion to award general damages. In support of this position, Riverside cites Chmurka v. Southern Farm Bureau Insurance Company, 357 So.2d 1207 (La.App. 4th Cir.1978). However, we find that Chmurka defeats, not supports Riverside's proposition. Specifically, the trial court in Chmurka held that the plaintiff was not entitled to general damages because the scar was not noticeable in public circumstances. The appellate court reversed noting that where either "the scar is in itself disfiguring or whether its detracting features have been magnified in [the] plaintiff's mind," there is a compensable injury. Chmurka, 357 So.2d at 1209.
From the testimony, the jury could have concluded that the scar's detracting features had been magnified in Leatherman's mind. Accordingly, we cannot find that the jury's general damage award constituted a clear abuse of discretion that warrants modification.

DECREE
For the reasons stated in this opinion, the judgment of the trial court is modified in part and affirmed in part. That part of the judgment assessing Leatherman with 15% fault is changed to allocate 30% of the fault to him. The part of the judgment awarding $49,000 in general damages is affirmed. Each party is to bear its own costs of the appeal.
NOTES
[1] Leatherman's main contention at trial was that the water heater setting of 150 degrees at the time of the accident was too high and was the cause of the subject accident. He contends that the temperature setting should have been 120 degrees. Dr. Hargroder, whose medicine practice focuses in burns, testified that exposure to water with a temperature of 140-150 degrees could cause a third degree burn in one to two seconds. However, Dr. Hargroder also testified that a third degree burn like the one sustained by Leatherman could have resulted from 30 seconds of exposure to water with a temperature of 120 degrees. Thus, as Leatherman testified that the water ran on his foot for up to 30 seconds, the proposed 120 temperature would not necessarily have prevented the subject injury.