GAIDRY, J.
1 j)The State of Louisiana, through the Department of Transportation and Development, appeals a trial court judgment finding it liable in damages to the plaintiffs, Dennis Hager and Maira Hager, based upon the trial court’s finding that a section of Louisiana Highway 308 was unreasonably dangerous in contributing to the occurrence of a single-vehicle accident. The plaintiffs and the other defendant, Ton Phan, separately answered the appeal. For the following reasons, we reverse the judgment in part on the issue of apportionment of fault, but affirm it in all other respects, and deny the answers to the appeal.
FACTUAL BACKGROUND AND PROCEDURAL HISTORY
Louisiana Highway 308 is a two-lane paved highway situated to the east of Bayou Lafourche, and generally parallels the meandering course of the bayou as it flows southwest from its source in Donaldson-ville in Ascension Parish. On the morning of Saturday, November 17, 2001, Dennis Hager, his wife, Maira Hager, and their six-year-old daughter Chelsea were raking leaves in the front yard of their home near Donaldsonville. The Hager residence was situated along Louisiana Highway 308, to the west of its southbound lane. April Phan, who was sixteen years old, also resided along Highway 308, south of the Hager residence, with her family. That morning, Ms. Phan was driving an automobile northbound in a curve when she was momentarily distracted and allowed the automobile to leave the northbound lane, cross over the center line and the opposite lane, and leave the highway. The automobile entered the Hagers’ front yard, striking Mr. Hager and Chelsea before coming to rest with Mr. Hager pinned beneath it. Although Chelsea’s injuries were relatively minor, Mr. Hager suffered multiple injuries that required his hospitalization and surgery.
1 sMr. and Ms. Hager instituted this litigation seeking damages for themselves and Chelsea on September 11, 2002, naming as defendants the State of Louisiana, through the Department of Transportation and Development (DOTD), and Ton Phan, April Phan’s father.[1] The matter proceeded to a bench trial on December 13 and 14, 2005, at the conclusion of which the trial court took the matter under advisement pending the submission of posttrial memo-randa. The trial court rendered and signed its judgment on February 15, 2006, apportioning 65% of the fault for the accident to DOTD and 35% to Ms. Phan. In its judgment, it awarded Mr. Hager special damages of $98,018.54 and $375,000.00 in general damages. The trial court awarded Ms. Hager special damages of $624.00 and general damages of $60,000.00. The plaintiffs were also awarded $9,555.82 in special damages and $25,000.00 in general damages for Chelsea’s injuries. On March 3, 2006, the trial court issued its written reasons' for judgment.
*459 On April 5, 2006, the trial court signed an amended judgment based upon the parties’ joint motion, assessing court costs against the defendants, DOTD and Mr. Phan, in the same proportions as the apportionment of fault. DOTD now appeals, challenging the trial court’s finding of liability on its part and its awards of general damages to Mr. and Ms. Hager. The plaintiffs and Mr. Phan separately answered the appeal, seeking to increase the degree of fault assigned to DOTD from 65% to 85%.
ASSIGNMENTS OF ERROR
We summarize DOTD’s assignments of error on the part of the trial court as follows:
(1) The trial court committed legal error by incorrectly considering evidence defined as inadmissible under the provisions of La. R.S. 48:35(F) pin determining that the section of highway at issue was unreasonably dangerous and that DOTD was hable to the plaintiffs.
(2) The trial court erred in finding that DOTD had constructive notice of the absence of curve warning signs due to its failure to maintain a sign inventory.
(3) The trial court erred in finding that any defect in the highway was a cause-in-fact of the accident at issue.
(4) The trial court erred in its assessment of the comparative fault of the defendants.
(5) The trial court abused its discretion in awarding excessive damages to the plaintiff, Maira Hager.
(6) The trial court abused its discretion in awarding excessive general damages to the plaintiff, Dennis Hager.
THE TRIAL EVIDENCE
The Accident: Fact Witnesses
April Phan, the driver of the automobile, testified that she had been living along Highway 308 for four to five years at the time of the accident, and was then sixteen years old. She received her driver’s license when she turned sixteen, about six months earlier. On the morning of the accident, she and her father, Ton Phan, left their home at about 8:00 a.m. to travel to an automobile dealership in Baton Rouge. She was driving a used Toyota Corolla automobile purchased a few days earlier from the dealership. The weather was clear. They traveled north on Highway 308, past the Hager residence, and, upon entering Donaldsonville, Mr. Phan realized that he had left his cellular telephone and the vehicle insurance cards at home. They drove back home on Highway 308 to retrieve those items, and then resumed their trip.
| ^Highway 308 had a series of curves immediately south of the Hager residence. There was a short section of straight roadway between the second-to-last and last curve of the series. While approaching or entering the last curve, Ms. Phan was distracted when her father placed the cellular telephone in the center console between the seats. She claimed that she looked down for only “a second” or “split second,” and that upon looking up again her automobile was leaving the opposite or southbound lane of the highway. Ms. Phan believed that while she was looking away from the roadway ahead, the automobile traveled in a straight path to the point where it left the roadway. She claimed that she tried to steer back onto the roadway, but there was no shoulder, and the automobile left the roadway, throwing up dust and gravel, and its airbags inflated. When the automobile came to rest, it was *460 facing south, opposite of its original travel direction.
Ms. Phan testified that she was familiar with the series of curves on Highway 308 south of the Hager residence prior to the accident, traveling through them on a daily basis while attending school in Donaldson-ville. She also admitted that she was familiar with the adjacent ditches along that section of the highway. She was driving at a speed of about 40 miles per hour while negotiating the series of curves, and usually drove at that speed through the area on prior occasions.
Ms. Phan recalled that on the date of the accident there were no road curve warning signs or speed advisory signs along the northbound lane of the highway section at issue, but was uncertain if any such signs were present along the southbound lane. She claimed that if a chevron sign or other curve warning sign had been present in the short section of straight roadway between the last two curves, “I wouldn’t have took my eyes off the road; it would have warned me.”
| fiMaira Hager testified that on the morning of the accident, she and her husband decided to clean their front yard. Mr. Hager was raking leaves near an oak tree, not far from the edge of the roadway, and the couple’s six-year-old daughter, Chelsea, was standing near her father, talking to him. Ms. Hager was raking leaves nearby, but on the other side of the tree. She heard a “strange noise,” looked up, and saw an automobile coming toward her. She then saw Chelsea’s body fly in front of the tree as the automobile passed Chelsea and struck the oak tree, making a noise “like a big explosion.” Ms. Hager screamed and ran to her daughter, who was unconscious. She picked Chelsea up and carried her to a safe place. Ms. Hag-er was crying and hysterical (“[M]y mind was out”), fearing that her daughter was dead. After a few minutes Chelsea regained consciousness and told Ms. Hager that she was “fine” and not to cry.
After Chelsea regained consciousness, Ms. Hager heard her husband calling for help. When she realized that Mr. Hager was under the automobile, she ran to the roadway screaming for help. When some men arrived, she asked them to remove the automobile. She then ran to the nearby Acadian Ambulance station seeking assistance, but no one responded. While running back to the accident scene, she fell on the roadway, and testified that “[everything turn[ed] black in my mind.” Someone assisted her in getting up, and she ran back to the scene, where members of the local fire department were moving her husband. Shortly thereafter, the ambulance from the station arrived. As Mr. Hager was being placed in the ambulance, he was conscious and asking for Chelsea.
Ronald Fernandez was one of the men who removed the automobile from on top of Mr. Hager. He was at his parents’ home, located about 200 to 300 yards south of the Hager residence, when he and his brother heard the [7crash from the accident and Ms. Hager screaming. They went to the scene and saw Mr. Hager lying under a Toyota Corolla that was facing south and located in the Hagers’ yard, near the roadside ditch. Mr. Fernandez and his brother rolled the automobile over on its side to free Mr. Hager, who was upset and repeatedly asked about his daughter. Mr. Fernandez tried to calm Mr. Hager and to restrain him from moving until emergency medical personnel arrived. Mr. Fernandez testified that he was aware of other accidents that occurred when vehicles left the roadway in the vicinity of the Hager residence, including one after the accident at issue in which a vehicle entered the Hagers’ yard. That vehicle, however, had been traveling in the *461 opposite direction from that of Ms. Phan’s automobile.
Mark Rodrigue was a motorist and nearby resident who came upon the accident scene shortly after it occurred. After he came around the last curve of the series of curves, he observed dust from the occurrence of the accident. He stopped his vehicle and heard Ms. Hager screaming for someone to get the automobile off her husband. The automobile was facing south, and its driver’s side tires were at the edge of the roadway. Mr. Rodrigue assisted the Fernandez brothers in lifting the automobile so that the first responders from the local fire department could remove Mr. Hager from beneath the automobile. He was also aware of several other accidents that occurred in that section of Highway 308.
Trooper First Class Henry Reavis was the Louisiana State Police officer who investigated the accident. He testified that in addition to his initial academy training in accident investigation, he received training in accident reconstruction following the accident. When he arrived at the scene, Mr. Hager and Chelsea had already been taken by ambulance to the hospital. Trooper Reavis spoke with Ms. Phan, who told him that she had |sbeen driving in a curve in the northbound lane when she looked down, taking her attention from the roadway. She told him that when she looked up again, her automobile had crossed the center line and was in the opposite lane, and it was too late for her to perform any corrective maneuver. Her automobile left the roadway, striking the driveway culvert of the Hager residence before striking the two pedestrians in the yard.
Trooper Reavis testified that there was no physical evidence on the roadway itself to indicate where Ms. Phan’s automobile crossed the center line, a circumstance he attributed to the nature of its movement and the type of accident. However, he was able to determine the location where the automobile left the roadway from tire marks in the grass of the shoulder and ditch leading to the driveway culvert.[2] After striking the driveway culvert, the automobile traveled another forty feet before striking the oak tree in the Hagers’ yard and then striking the pedestrians and coming to rest on top of Mr. Hager.
The posted speed limit in the area where the automobile left- the roadway was 55 miles per hour, and Trooper Reavis had no reason to believe that Ms. Phan had been exceeding the speed limit. As the result of his investigation, Trooper Reavis concluded that the cause of the accident was driver error. With regard to the existence of any highway defects or substandard conditions, however, he deferred to the testimony of any traffic or highway engineers.
Highway Construction and Maintenance
The accident at issue occurred on Louisiana Highway 308 in Ascension Parish, within an area designated by DOTD as Control Section 19407 — 09 in DOTD’s Section 61, which extends from Donaldsonville southward to the boundary or parish line between Ascension and Assumption Parishes. DOTD’s project history records relating to this section date back to only 1937, although the highway (then designated as State Route 77) was already in the state highway system. Since that time, the highway section at issue has been the *462 subject of two relatively major projects. The first was assigned in 1948 (the 1948 project) and involved the placement of a new asphalt surface in place of the original gravel roadway. The second, assigned in 1975 (the 1975 project), involved the grading of the existing base, adding cement and a stabilizer, and placing an asphalt emulsion as a sealant, followed by an asphalt binder course and a final asphalt surface course.
At the accident location, Louisiana Highway 308 is a two-lane asphalt road with relatively narrow shoulders. With regard to the curve at issue, DOTD had no record of any curve warning sign having been put into place south of the Hager residence before June 6, 2003, over two and one-half years after the accident, and other evidence and testimony documented the absence of any such signs at the time of the accident. DOTD did not maintain a sign inventory for the highways located in its Section 61; instead, it primarily relied upon reports from law enforcement officers and the public and the memory of its employees conducting routine inspections to determine the need for placement or replacement of highway signs.
By letter dated October 3, 1991, the Ascension Parish Police Jury, through its secretary-treasurer, requested the placement of “speed limit” and “curve marker” signs on Louisiana Highway 308 from Don-aldsonville south to the Ascension-Assumption parish line. The following day, DOTD’s District 61 maintenance engineer replied, acknowledging the receipt of the Imletter and confirming that the sign maintenance crew would replace “any needed missing signs.”
Expert Testimony Relating to Liability
James R. Clary, Sr. testified on behalf of plaintiffs as an expert in civil and highway engineering. He reviewed the history and project plans relating to Louisiana Highway 308, DOTD manuals and standards, DOTD’s maintenance records, the standards promulgated by the American Association of State Highway and Transportation Officials (AASHTO) over the years, and depositions and documents relating to the accident at issue. He also conducted a number of inspections of the highway section at issue and the accident location. At the time of his first inspection, less than a year after the accident, there were no curve warning signs or speed advisory signs for northbound traffic in advance of or within the series of curves.
In connection with his inspection of the highway section, Mr. Clary prepared a detailed engineering drawing of the accident location and a sketch detailing the series of curves at issue. The first curve heading northbound had a sharp 9.2 degree curve to the right, followed by a short 100-foot tangent (straight section), which in turn was followed by a short shallow curve of 2.3 degrees to the left and another tangent of 135 feet. The next curve was a relatively short (150 feet) 3.0-degree curve to the left, followed directly by a sharp 10-degree curve to the right, in turn followed by a 140-foot tangent, followed by a sharp 12-degree curve to the right. That last curve ended near the Hagers’ driveway.[3]
*463 [nBased upon his review of DOTD’s manuals and standards, Mr. Clary expressed the opinion that both the 1948 project and the 1975 project constituted “major reconstructions” of the highway section at issue, and described various aspects of the highway’s design and construction that failed to meet the AASHTO and other equivalent standards in effect at those times. In particular, he emphasized the narrowness of the shoulder, the steepness of the shoulder, slope leading to the adjacent ditch, the sharpness of the curve at issue, and the relative proximity of the other curves on the stretch of roadway. In discussing recommendations contained in the 1965 American Association of State Highway Officials (AASHO — the predecessor of AASHTO) “blue book,” Mr. Clary pointed out that two sets of curves within the series of curves at issue involved short tangents between curves in the same direction, and that such alignment is hazard^ ous, as most drivers do not expect succeeding curves to be in the same direction.
Vernon “Dean” Tekell, an expert in the fields of highway design, traffic engineering, and highway safety, testified on behalf of DOTD. While Mr. Tekell discounted the causative role of the absence of curve warning and chevron signs in this particular accident, he specifically conceded that a “winding road” warning sign, combined with a speed advisory plate, should have been in place for northbound traffic in advance of the series of curves. Mr. Te-kell further admitted that when he served as a city traffic engineer he made use of sign inventories, and that the maintenance of a sign inventory as recommended by the Manual on Uniform Traffic Control Devices (MUTCD), while burdensome, was “very important” and “good practice.”
LIABILITY
The trial court expressly rejected the plaintiffs’ contentions that the 1948 project and the 1975 project constituted “major reconstructions” within |1g.the meaning of La. -R.S. 48:35(F), so as to impose a duty on DOTD to bring the section of highway at issue in compliance with the AASHTO standards contemporary with those projects’ plans. Nevertheless, the trial court found that those projects, combined with DOTD’s ongoing routine inspections of the highway for maintenance and repair, served to establish DOTD’s constructive knowledge of the defective condition of the highway section at issue. The court concluded that the highway section was unreasonably dangerous due to the combination of the sharpness of the curve at issue, the lack of curve warning and speed advisory signs, inadequate shoulder width, and the steepness of the shoulder slope. The trial court further found DOTD negligent for its failure to maintain a sign inventory. It referenced the testimony of a DOTD employee that curve warning signs were usually installed in pairs, one facing in each direction, and concluded that the presence of such a sign for southbound traffic prior to the series of curves was evidence of DOTD’s constructive knowledge that a corresponding sign for northbound traffic was needed.
In assessing the respective fault of the defendants, the trial court concluded that Ms. Phan’s conduct was the product of inadvertence, while DOTD was in a superi- or position to remedy the known highway defect. It therefore concluded that DOTD should be assigned 65% of the fault and Ms. Phan 35%.

General Principles

Louisiana Civil Code articles 2315 and 2316 are the codal foundation for delictual liability for negligence in our state. Louisiana Civil Code articles 2317 and 2317.1 define the basis for delictual liability for defective things. Article 2317.1 provides *464 that the owner or legal custodian of a defective thing causing injury or damage is liable “only upon a showing that 11she knew or, in the exercise of reasonable care, should have known of [the defect], that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.”[4] Louisiana Revised Statutes 9:2800 further circumscribes the liability of public entities, including DOTD, under La. C.C. arts. 2317 and 2317.1. At the time of the accident at issue,[5] it provided,' in pertinent part:
A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.
B. Except as provided for in Subsection A of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular .vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
C. Constructive notice shall mean the existence of facts which infer actual knowledge."
DOTD has a duty to maintain the public highways in a condition that is reasonably safe for persons exercising ordinary care and reasonable prudence. Toston v. Pardon, 03-1747, p. 10 (La.4/23/04), 874 So.2d 791, 799. DOTD must also maintain the shoulders and the area off the shoulders, within its right of way, in such a condition that they do not present an | uunreasonable risk of harm to motorists using the adjacent roadway and to others, such as pedestrians, who are using the area in a reasonably prudent manner. Netecke v. State ex. rel. DOTD, 98-1182, 98-1197, p. 8 (La.10/19/99), 747 So.2d 489, 495.
Ultimately, DOTD’s liability to the public for the condition of state highways “depends on all the facts and circumstances determined on a case by case basis.” Netecke, 98-1182 at pp. 8-9, 747 So.2d at 495. In determining the issue of DOTD’s legal responsibility relating to the condition of the highway at issue and its appurtenances, we begin with the following admonition from our supreme court:
In reaching an intelligent and responsible determination, the decision maker " must carefully consider all the circumstances surrounding the particular accident under review to determine whether DOTD’s legal duty encompassed the risk which caused the plaintiffs injuries and damages and was intended to protect *465 this plaintiff from this type of harm arising in this manner.
Netecke, 98-1182 at p. 15, 747 So.2d at 498. (Emphasis supplied.)

Design Standards and Guidelines

DOTD’s responsibility to provide minimum safety standards with respect to highway design, construction, and maintenance is set out in La. R.S. 48:35, originally enacted in 1968, which provides in part:
A. The Department of Transportation and Development shall adopt minimum safety standards with respect to highway and bridge design, construction, and maintenance. These standards shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials [AASHTO], Hereafter, the state highway system shall conform to such safety standards....
B. The chief engineer may designate highways within the state highway system for reconstruction or repair at standards which are less than those as approved by the American Association of State Highway and Transportation [AASHTO] Officials; however, no reconstruction or repair shall be done on any highway under this Part which results in a |1ñpavement width of less than eighteen feet, and all reconstruction or repair done under this Part shall be accomplished within the existing right-of-way.
[[Image here]]
F. (l)(a) The state, the Department of Transportation and Development, ... has a duty to maintain, repair, construct, or reconstruct any public ... highway, ... or any portion thereof, in a manner that is not unreasonably dangerous for a reasonably prudent driver.
(b) When any public ... highway, ... or any portion thereof, is maintained, repaired, constructed, or reconstructed in accordance with the standards, regulations, or guidelines in effect on the date of approval by the chief engineer, ... of the original or amended design for the construction or major reconstruction, whichever is later, of such public ... highway, ... or any portion thereof, there shall be a presumption that any such public ... highway, ... or any portion thereof, is maintained, repaired, constructed, or reconstructed in a reasonably safe condition.
(c) When any public ... highway, ... or any portion thereof does not conform to one or more standards, regulations, or guidelines established or adopted subsequent to the date of such approval of the original or amended design plan for the construction or major reconstruction, whichever is later, of any such public ... highway, ... or any portion thereof such nonconformity shall not render any such public ... highway, ... or any portion thereof unreasonably dangerous or defective.
(2) When determining whether or not an unreasonably dangerous condition exists under this Paragraph, if a standard, regulation, or guideline is not directly applicable to the maintenance, repair, construction, or reconstruction, then evidence of failure to adhere to such standard, regulation, or guideline shall not be admissible in a court proceeding for any purpose. (Emphasis supplied.)
The case of Temple v. State ex rel. Dep’t of Transp. and Dev., 02-1977 (La.App. 1st Cir.6/27/03), 858 So.2d 569, writ denied, 03-2116 (La.11/7/03), 857 So.2d 501, arose from an accident that occurred prior to the effective date of the 1999 amendment to La. R.S. 48:35. In Temple, we observed *466 that “[u]nder the holdings of Petre [v. State ex rel. Dep’t of Transp. & Dev., 01-0876 (La.4/3/02), 817 So.2d 1107] and Aucoin [v. State through Dep’t of Transp. & Dev., 97-1988, 97-1967 (La.4/24/98), 712 So.2d 62], [a] plaintiff may use post-construction standards, such as AASHTO, as an aid or piece of the puzzle in his attempt to prove that the roadway was unreasonably dangerous.” Id., 02-1977 at p. 7, 858 So.2d at 576. But we further noted that “[f]or cases arising after July 9, 1999, the ‘evidence of failure to adhere to [a post-construction] standard, regulation, or guideline shall not be admissible in a court proceeding for any purpose.’ La. R.S. 48:35 F(2).” Id., 02-1977 at p. 7 n. 1, 858 So.2d at 576 n. 1. The foregoing language, although dictum, thus interprets the phrase “directly applicable” in a temporal context; that is, in order for a standard or guideline to be “directly applicable” and admissible for the purpose of determining the existence of an unreasonably dangerous condition, it must have been adopted prior to the date of approval of the original or amended design plan for the last construction or major reconstruction of the roadway. See La. R.S. 48:35(F)(l)(b) and (c). Thus, Aucoin’s former relevancy rule, permitting consideration of post-construction highway safety standards or guidelines in determining DOTD’s liability, has been legislatively overruled.
Based upon the evidence introduced at trial, the trial court expressly found that the two major projects undertaken by DOTD in 1948 and 1975 were not “major reconstructions,” but rather “resurfacing projects.”[6] The plaintiffs do not challenge this finding. Thus, DOTD’s failure to upgrade |17the section of highway at issue on those occasions to the contemporary AASHTO or equivalent standards, taken alone, cannot serve as a basis for its liability.
DOTD contends that the trial court committed legal error in relying upon inadmissible post-construction design standards in determining its fault. We disagree with that contention. The trial court permitted the introduction of such evidence in connection with Mr. Clary’s testimony only because, at that time, the court had not yet determined the issue of whether the 1948 and 1975 projects constituted “major reconstructions;” until it determined that open question, any standards adopted prior to those projects were potentially relevant. The trial court’s judgment and written reasons for judgment do not support a conclusion that the trial court assigned such evidence improper weight or actually relied upon it after finding no major reconstruction took place.[7]
*467 The trial court’s finding of fault on the part of DOTD is reasonably supported by the totality of the trial evidence and testimony relating to the physical characteristics of the series of curves and the particular curve at issue, their effect on vehicular movement, and the role of appropriate signage or the lack thereof, rather than upon strict compliance with applicable highway design standards or post-construction standards. According to La. R.S. 48:35(F)(l)(b), compliance with applicable standards establishes only a rebutta-ble presumption that the highway’s compliant characteristics are “reasonably safe”; it does not preclude a finding, based upon other evidence, that those characteristics are in fact unreasonably dangerous and that DOTD was negligent. In short, compliance or 11Rnoncompliance with AASHTO or other applicable design standards does not end the factfinder’s ultimate determination of fault; it is only one fact, albeit an important one, that the factfinder must weigh in determining fault and the causative role of any fault.
Louisiana Revised Statutes 32:235(A)(1) requires DOTD to “adopt a manual and specifications for a uniform system of traffic control devices” for state highways, conforming as far as possible to the current approved standards of the Federal Highway Administration. The manual so adopted is the MUTCD. See 23 C.F.R. § 655.601, et seq.; Jacques v. State ex rel. Dep’t of Transp. & Dev., 03-2226, p. 10 (La.App. 1st Cir.9/17/04), 905 So.2d 294, 299, writ denied, 04-3013 (La.2/18/05), 896 So.2d 36.
Even if the' post-construction AASHTO standards were inadmissible for purposes of determining whether the highway’s geometric and other physical features were unreasonably dangerous in terms of their maintenance, repair, construction, or' reconstruction, it could certainly have been admissible for the limited purpose of determining whether those features warranted appropriate warning signs under the MUTCD. It is well settled that evidence inadmissible for one purpose may nevertheless be relevant and admissible for another purpose. La. C.E. art. 105; State v. Morgan, 02-3196, p. 9 (La.1/21/04), 863 So.2d 520, 525. Thus, the post-construction AASHTO standards discussed by Mr. Clary relative to the angle or degree of the curve at issue, its effect on vehicular negotiation of the curve, and the width and slope of the shoulder were independently relevant for the limited purpose of assessing DOTD’s compliance with its duty to install and maintain traffic control devices and warnings to alert motorists of potentially unsafe conditions. We do not read La. R.S. 48:35(F)(2) as precluding the consideration of the post-construction 118standards for such a limited purpose, distinct from the prohibited purpose of determining that any nonconformity of the features was itself unreasonably dangerous.[8]

Constructive Notice

While DOTD cannot be imputed with knowledge of every defect on its roadways and shoulders, neither can DOTD escape liability by negligently failing to *468 discover that which is easily discoverable. Brown v. La. Indem. Co., 97-1344, p. 8 (La.3/4/98), 707 So.2d 1240, 1244. Here, the evidence confirms that DOTD conducted biweekly inspections of the highway section at issue. The plaintiffs put forth competent evidence establishing a prima facie case of the absence of any “winding road” or curve warning signs or chevrons for the northbound lane at the time of the accident and for an indefinite prior period. That evidence was not refuted by DOTD. The admitted presence of the signs for the southbound lane, without corresponding signs for the northbound lane, could have alerted DOTD’s district maintenance crew to the presence of a potentially hazardous condition, as the trial court expressly concluded in its written reasons. We cannot conclude that the trial court was clearly wrong in finding that DOTD had constructive notice of the dangerous condition and the opportunity to correct it.

Cause-In-Fact

The causal relationship of the absence of appropriate signage to the occurrence of the accident was a fact issue, resolved by the trial court in favor of the plaintiffs. In addition to the admittedly self-serving testimony 12nof Ms. Phan, however, the trial court had the benefit of detailed photographic and other documentary evidence regarding the dangerous condition of the series of curves at issue, as well as expert testimony regarding the role of signage in drivers’ perception. Considering the record in its entirety, and giving due deference to the trial court’s credibility assessments, we find no manifest error in the trial court’s conclusion that an unreasonably dangerous condition existed and was a causative factor in the accident.

Allocation of Fault

In Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985), the supreme court articulated the factors appropriate for consideration in allocating fault between two or more parties:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Prior to articulating the foregoing standard, the supreme court in Watson made a point of observing that “appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court.” Id., 469 So.2d at 972, citing Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). It further held |2ithat proper review requires the appellate court to determine whether that finding, even if supported by evidence, was clearly wrong or manifestly erroneous. Watson, 469 So.2d at 972. Stating the principle somewhat differently, the court concluded:
It is not enough to sustain the determination of the district court when *469 “there is some reasonable evidence to support the finding.” Rather, the appropriate question is, was that finding clearly wrong or manifestly erroneous.

Id.

Thus, a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court’s finding. The reviewing must review the record in its entirety to determine whether the trial court’s finding was clearly wrong or manifestly erroneous. Stobart v. State, Through Dep’t of Transp. & Dev., 617 So.2d 880, 882 (La.1993).
The allocation of comparative fault between joint tortfeasors is a factual determination, and the trier of fact’s allocation is therefore owed deference. Snearl v. Mercer, 99-1738, p. 27 (La.App. 1st Cir.2/16/01), 780 So.2d 563, 584, writs denied, 01-1319 (La.6/22/01), 794 So.2d 800 and 01-1320 (La.6/22/01), 794 So.2d 801. Reviewing the entire record and applying the Watson factors to the comparative conduct of Ms. Phan and DOTD, however, we must agree with DOTD’s contention that the trial court’s apportionment of 35% fault to Ms. Phan and 65% fault to the DOTD was clearly wrong and contrary to the evidence.
DOTD’s duty to maintain safe shoulders encompasses the foreseeable risk that for any number of reasons a motorist might find himself on, or partially on, the shoulder. Law v. State ex rel. Dep’t of Transp. and Dev., 03-1925, p. 5 (La.App. 1st Cir.11/17/04), 909 So.2d 1000, 1004, writs denied, 04-3154, 04-3224 (La.4/29/05), 901 So.2d 1062. The duty to 22maintain highway shoulders in a reasonably safe condition, however, does not render DOTD the guarantor of the safety of all the motoring public. Lasyone v. Kansas City S. R.R., 00-2628, p. 8 (La.4/3/01), 786 So.2d 682, 690. It is certainly doubtful whether DOTD’s general duty to maintain safe shoulders is so broad as to extend the duty to maintain the southbound shoulder of a highway for the benefit pf a careless northbound motorist who crosses the entire highway and enters the southbound shoulder before realizing her dilemma. Thus, the trial court’s determination that DOTD was negligent in maintaining the southbound shoulder and that such negligence was a contributing legal cause of plaintiffs’ damages was probably erroneous. But because its finding of fault on DOTD’s part is reasonably supported on other factual bases, any such error does not interdict its ultimate finding of fault, and we pretermit further discussion relating to the highway’s shoulder slope.
While Ms. Phan’s conduct in leaving her lane of travel, crossing the center line, and leaving the roadway- resulted from inadvertence, the inadvertent negligence occurred within the context of her operation of a motor vehicle on a fámiliar section of roadway, on which she had traveled twice within the course of a half-hour earlier that day. The social utility of Ms. Phan’s attention being voluntarily diverted to an inactive cellular telephone being handled by a passenger can only be described as nil. See, e.g., Snearl, 99-1738 at p. 26, 780 So.2d at 583. The dangers of cellular telephone usage while operating a motor vehicle have been extensively publicized well before the date- of the accident at issue. Even if the telephone had been ringing, her father could have answered it. There was no legitimate excuse for her distraction and its duration, especially in light of her admitted familiarity with the highway area and its curves. Many things 122can distract a motorist, but a motorist has the duty to keep his attention focused on the roadway. Clark v. Mitchell, 99-0720, p. 8 (La.App. 1st Cir.5/12/00), 760 *470 So.2d 1236, 1242, writ denied, 00-2374 (La.11/3/00), 772 So.2d 660.
The trial court concluded in its reasons that “[a]s a new and inexperienced driver, [Ms.] Phan would have relied upon road signs to identify any unusual road conditions.” This is plainly a speculative assumption. While the evidence supports the finding that the absence of curve warning and speed advisory signs contributed to the accident, the highway was properly marked with clearly visible fog lines and a double yellow “no passing” lines prior to and through the curve at issue. The trial court clearly erred in giving inordinate weight to the absence of signage, as compared to the strict duty of a driver to maintain a proper lookout. This duty rests upon all licensed drivers, not just experienced ones, and Ms. Phan’s inexperience should not lessen or mitigate that basic, fundamental duty imposed upon her as a licensed driver.[9] We find it significant that the benchmark Watson ease involved consideration of the proper apportionment of fault to an inexperienced twelve-year-old hunter. There, the supreme court reversed a jury verdict exculpating the minor from negligence in the shooting death of an adult hunter, increasing his degree or percentage of fault and that of his father to 40% each, observing that “[t]he twelve year old must share some responsibility for this death in view of his own negligence in firing a dangerous weapon at a man he presumed to be a deer.” Watson, 469 So.2d at 973.
li^As to the risks created by the respective conduct of DOTD and Ms. Phan, the trial court concluded that this factor militated against DOTD more than Ms. Phan. We disagree. While the lack of signage combined with the degree of curvature did contribute to a risk of northbound drivers failing to properly negotiate the curve safely, that risk was a relatively passive factor during daylight hours, and not as significant as the active risk created by a driver failing to pay proper attention and allowing a moving motor vehicle to leave its proper lane of travel, enter the opposing lane (thereby endangering any oncoming traffic), cross the entire roadway, and enter the opposite (rather than the adjacent) shoulder.
We conclude that the factor relating to the respective capacities of the actors weighed equally against the defendants, rather than more heavily against DOTD. While it is true that DOTD had at the very least constructive knowledge of the dangerous nature of the unmarked curve and had the superior resources and capacity to remedy that situation, Ms. Phan had the superior (and sole) opportunity at the time of the accident, or the “last clear chance,” to control the movement and speed of her vehicle within a curve with which she was admittedly familiar, and to resist trivial distractions from her driving duties. See Snearl, 99-1738 at p. 26, 780 So.2d at 583.
If the court of appeal finds an apportionment of fault by the trial court clearly erroneous, it should raise or lower it to the highest or lowest point reasonably within the trial court’s discretion. Clement v. Frey, 95-1119, pp. 7-8 (La.1/16/96), 666 So.2d 607, 611; Leatherman v. Riverside Village, 95-2227, p. 4 (La.App. 1st Cir.6/28/96), 676 So.2d 1180, 1183. Based *471 upon our review of the evidence, in light of the jurisprudence discussing the comparative fault of negligent motorists and DOTD, we conclude that the lowest percentage of fault on Ms. Phan’s part reasonably within the trial [^court’s discretion was 60%, and the highest percentage of fault attributable to DOTD to be 40%. See Brown, 97-1344 at pp. 10-11, 707 So.2d at 1245-46. We accordingly reverse the trial court’s judgment in part as to the respective allocation of fault between DOTD and Ms. Phan, and render judgment assigning 60% fault to Ms. Phan and 40% fault to DOTD. See, e.g., Snearl, 99-1738 at pp. 25-26, 780 So.2d at 582-83. For the same reasons, we deny the plaintiffs’ and Mr. Phan’s answers to the appeal, as lacking merit.
DAMAGES

Ms. Hager’s Loss of Consortium and Related General Damages

Louisiana Civil Code article 2315(B) authorizes the recovery of loss of consortium, service, and society as damages by the spouse of an injured person. Loss of consortium includes such pecuniary elements as loss of services and such nonpecuniary components as kris of love, companionship, affection, society, sexual relations, comfort, and solace. Emery v. Owens-Corporation, 00-2144, p. 20 (La.App. 1st Cir.11/9/01), 813 So.2d 441, 456, writ denied, 02-0635 (La.5/10/02), 815 So.2d 842.
Louisiana Civil Code article 2315.6 authorizes the spouse and other close relatives of an injured person to recover damages for mental anguish or emotional distress suffered as- the result of such injury, if they witness the event or come upon its scene soon thereafter, and if the relative’s mental anguish or emotional distress is “severe, debilitating, and foreseeable.” The article codifies that element of damages first authoritatively recognized by the supreme court in Lejeune v. Rayne Branch Hasp., 556 So.2d 559 (La.1990); hence its common designation as “Lejeune damages.” See Held v. Aubert, 02-1486, pp. 5-6 (La.App. 1st Cir.5/9/03), 845 So.2d 625, 630-31.
1 aThe witnesses who rendered assistance at the accident scene recalled that Ms. Hager was screaming for someone to get the automobile off Mr. Hager, and that she ran to seek assistance from the nearby ambulance service office. According to one of her co-workers who was with her in the emergency room of St. Elizabeth Hospital immediately after the accident, Ms. Hager was “very upset,” “crying a lot,” and “hysterical.” The trial court in its reasons concluded that Ms. Hager suffered “psychological trauma” as the result of her witnessing the accident involving her husband and child, entitling her to recovery Lejeune damages.
DOTD challenges the award of damages to Ms. Hager solely on the legal ground that it constituted an abuse of discretion because it exceeded the amount she requested in her posttrial memorandum. It does not specifically challenge the award on the ground that it exceeds the fair and reasonable range of damages in the trial court’s great discretion, nor on the basis that Ms. Hager failed to prove the necessary elements for recovery Lejeune damages.
Since 1989, La. C.C.P. art. 893 has prohibited the inclusion of an ad damnum clause stating the specific amount of monetary damages sought. Even prior to that time, however, as correctly emphasized by plaintiffs, this court recognized, at least in dicta, that such a clause did not limit the trial court in awarding damages in an amount supported by the evidence. McCarroll v. Asplundh Tree Expert Co., *472 427 So.2d 881, 886-87 (La.App. 1st Cir. 1982) (on rehearing), writ denied, 432 So.2d 268 (La.1983). There is even less reason to limit a plaintiffs recovery based upon the content of a brief or memorandum, which is not even a pleading. In awarding general damages, a trier of fact is not limited by a party’s argument on the appropriate quantum of such damages, unless such argument is joined with a factual stipulation or judicial confession on that factual issue. See, e.g., La. C.C.P. art. 1732 and Guidry v. Millers Cas. Ins. Co., 01-0001, p. 8, 822 So.2d 676, 682. Absent such a binding stipulation, the trier of fact is free to award that amount of general damages it finds to be most reasonable and appropriate within a vast range of reasonable discretion, considering the nature, duration, and effect of the particular injuries on the particular plaintiff.
Despite the foregoing observations, and giving DOTD the benefit of the doubt, DOTD’s assignment of error conceivably could be interpreted as a general objection to an excessive award constituting an abuse of discretion. We will therefore briefly review the relevant factors of the nature, duration, and effect of the damages sustained by Ms. Hager.
Ms. Hager is a native of Honduras and had no close family members nearby, other than her husband and daughter. The trial court was evidently impressed with Ms. Hager’s credibility and the effect of the accident and the injuries to her husband and daughter upon her. Even though Ms. Hager, as a hospital radiology assistant, was presumably familiar with traumatic injuries, the impact upon her of the injuries to her spouse and child was obviously not mitigated thereby. It does not require expert psychiatric or psychological testimony to conclude from the undisputed evidence that Ms. Hager, who was in close proximity to her husband and child and nearly struck herself, suffered intense fear for their lives and emotional trauma during the course of the terrifying episode and its immediate aftermath. Until her daughter regained consciousness, she suffered the anguish, shock, and grief of a mother for the potential loss of her only child. Although that profound terror and anguish Ms. Hager experienced was relatively brief in duration, the evidence supports the finding that it was quite real. Until her husband’s physicians advised Ms. Hager that he was out of danger, she suffered the almost overwhelming fear, anguish, and stress associated with the threatened loss of a spouse. Ms. Hager Isswas later forced to assist her husband in dealing with his temporary physical disability while confined to his home. During that time, she was also necessarily burdened with the loss of his physical assistance in certain family and household tasks.
Although the trial court’s general damages award to Ms. Hager did not particularize any respective amounts awarded for loss of consortium, services, and society as opposed to mental anguish related to the injuries to her husband and daughter (the Lejeune damages), the total amount for both elements of general damages does not appear excessive, given the evidence. Considering all the circumstances and the vast discretion vested in the trier of fact in awarding general damages, we find no abuse of discretion in the trial court’s award of $60,000.00 to Ms. Hager.

Mr. Hager’s General Damages

Mr. Hager was 50 years old at the time of the accident, and 54 years old at the time of trial. As the result of the accident, Mr. Hager sustained multiple injuries, including a comminuted fracture of the right clavicle or collarbone, which was broken into five parts; abdominal injuries consisting of mesenteric artery and vein *473 lacerations and hematoma and hemorrhages of the peripancreatic and periduodenal areas; a compound fracture of the left middle finger; a rib fracture; and multiple bruises and contusions. He experienced internal bleeding in his abdominal cavity as the result of his injuries,- and lost a substantial amount of blood. He was hospitalized for nine days, spending the majority of that stay in the hospital’s intensive care unit. His abdominal injuries necessitated an emergency exploratory la-porotomy and surgical repair of the blood vessel hemorrhages, and he also underwent surgery to reduce the compound fracture of his finger.
|¾⅞4⅛. Hager testified at trial that he had only fragmentary memories of events immediately after the accident, including his asking for his daughter and hearing his daughter telling his wife that she was “all right” while in the ambulance. He had no memory of his hospitalization prior to the fourth day, when he began to regain consciousness. He did not regain full consciousness until a few days later. He was able to walk without the benefit of crutches about five to six weeks after the accident.
Following his initial discharge from the hospital, Mr. Hager’s comminuted clavicle fracture was not healing properly, and on January 8, 2002, he underwent surgery consisting of an open reduction and internal fixation of the fracture. His orthopedic surgeon, Dr. Darryl W. Peterson, installed a titanium plate with screws to hold the bone fragments in place, and also grafted bone taken from Mr. Hager’s right hip to assist the fusion of the fragments.
Dr. Peterson subsequently determined that the fixation plate had broken and the bone had not healed, resulting in a nonunion. Mr. Hager consulted another orthopedic surgeon, Dr. Nick Hatzis, and underwent another surgical procedure consisting of an open reduction and internal fixation on June 13, 2002, with placement of bone grafts from the left hip and an internal stimulator to enhance bone healing. That surgery was again unsuccessful in achieving union of the clavicle, and the plate again broke. A third surgery, limited to the removal of the broken plate and screws and placement of artificial bone graft putty, was performed by Dr. Hatzis on July 24, 2003. As of the time of trial, Mr. Hager was left with a chronic nonunion of the clavicle, which Dr. Hatzis felt would likely be permanent, and a permanent impairment rating of 5 to 10% of the body as a whole due to that injury.
lanThe surgical procedures have left some residual scarring, both at the primary surgical sites and where bone for- the attempted fusion was harvested from both hips. Mr. Hager also testified that he feels “fragile” because of fears of reinjury to his shoulder, avoids activities that might result in stress or trauma to his shoulder, and cannot sleep on his right side if his weight rests upon that shoulder. He cannot straighten the injured finger on his left hand, which causes him difficulty in performing some tasks, such as playing his guitar for recreation.[10] His finger fracture resulted in a permanent impairment rating under the American Medical Association guidelines of 5% of the extremity and 3-4% of the whole person.
“General damages” involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money. Boudreaux v. Farmer, 604 So.2d 641, 654 (La.App. 1st *474 Cir.), writs denied, 605 So.2d 1373, 1374 (La.1992). The primary objective of general damages is to restore the party in as near a fashion as possible to the state he was in at the time immediately preceding injury. Daigle v. U.S. Fidelity and Guar. Ins. Co., 94-0304, p. 7 (La.App. 1st Cir.5/5/95), 655 So.2d 431, 437. The factors to be considered in assessing quantum of damages for pain and suffering are severity and duration. Thibodeaux v. USAA Cas. Ins. Co., 93-2238, p. 8 (La.App. 1st Cir.11/10/94), 647 So.2d 351, 357.
The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Wainwright v. Fontenot, 00-0492, p. 6 (La.10/17/00), 774 So.2d 70, 74; Youn v. Maritime Overseas Corporation, 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The discretion vested in the trier of fact in fixing general damages has consistently been described as “great, and even vast, so that an appellate court should rarely disturb an award of general damages.” Youn, 623 So.2d at 1261.
As to the issue of mitigation of damages raised with regard to Mr. Hag-er’s failure to quit smoking after surgery, our jurisprudence has long recognized that an injured plaintiff has the duty to exercise reasonable diligence and ordinary care to minimize his damages after the injury has been inflicted. Jacobs v. New Orleans Public Service, Inc., 432 So.2d 843, 845 (La.1983). The determination of whether an injured plaintiff has complied with his duty to exercise reasonable care under the circumstances to mitigate his damages is necessarily a factual determination. Given the equivocal nature of the medical evidence regarding the potential causes of the nonunion, we cannot conclude that the trial court erred in finding that DOTD failed to meet its burden of proof by a preponderance of the evidence on the issue of mitigation of damages, and in resolving that issue in favor of Mr. Hager.[11]
The amount of the general damages award, $375,000.00, is not obviously disproportionate to the nature of the physical injuries and impairment, their emotional toll, and related subjective losses sustained by Mr. Hager. Mr. Hager’s complaints were consistent from the date of the accident and throughout his treatment, and the trial court evidently felt his trial testimony as to the effect of his injuries on his life and his family was ^sincere. Our ovm review of the bare transcript suggests that, if anything, Mr. Hager was relatively stoic in describing his injuries and their effect. We find no abuse of the trial court’s great discretion as to the award of general damages to Mr. Hager. Although DOTD cites a number of cases illustrative of lower general damages awards for comparable injuries, as we discern no abuse of discretion, it is inappropriate and unnecessary for us to undertake a comparison of the award in this case with past awards. See Youn, 623 So.2d at 1260; Oden v. Gales, 06-0946, pp. 11-12 (La.App. 1st Cir.3/23/07), 960 So.2d 114, 121.
*475 DECREE
The judgment of the trial court, apportioning the degree or percentage of fault, is reversed in part, and judgment is rendered herein re-apportioning the degree of percentage of fault and the defendants’ corresponding liability for damages and costs as follows: 60% to the defendant-appellee, Ton Phan, and 40% to the defendant-appellant, the State of Louisiana, through the Department of Transportation and Development. The costs of this appeal are assessed to the parties in the same respective proportions, the portion of the defendant-appellant, the State of Louisiana, through the Department of Transportation and Development, being fixed at $5,044.74. In all other respects, the judgment of the trial court is affirmed. The answers to the appeal of the defendant-appellee, Ton Phan, and the plaintiffs-ap-pellees, Dennis Hager and Maira Hager, are denied.
REVERSED IN PART, AFFIRMED IN PART, AND RENDERED; ANSWERS TO APPEAL DENIED.
KUHN and WELCH, JJ., concur in the result.

. In the caption and body of their petition, the plaintiffs inadvertently misspelled Ms. Hag-er's name as “Mayra” and Mr. Phan’s name as "Tom.”

. On the diagram he prepared as part of his accident report, Trooper Reavis depicted the automobile leaving the southbound lane and entering the shoulder and ditch only a short distance south of the driveway culvert. That distance was not specified in his testimony, however.

. The use standards for a "Winding Road” sign in the Manual on Uniform Traffic Control Devices (MUTCD) provide that it "is intended for use where there are three or more turns or curves ... separated by tangent distances of less than 600 feet.” Those standards also provide that "[ajdditional warning may be provided ... by use of the Advisory Speed plate.” Mr. Clary testified that DOTD’s own 1943 design standards for curves limited the maximum curvature to 6 degrees. DOTD challenges his reliance upon that standard as improper and inadmissible under La. R.S. 48:35(F)(2).

. The trial court in its reasons referred to liability for defective things under La. C.C. art. 2317 (and, by necessary implication, art. 2317.1) as "strict liability." Strictly speaking, this is incorrect, as such liability is predicated upon negligence. The former concept of "strict liability" for defective things under the previous versions of La. C.C. arts. 2317 and 2322 was legislatively abolished in 1996. See Dennis v. The Finish Line, Inc., 99-1413, p. 5 n. 8 (La.App. 1st Cir. 12/22/00), 781 So.2d 12, 21 n. 8, writ denied, 01-0214 (La.3/16/01), 787 So.2d 319; 12 William E. Crawford Louisiana Civil Law Treatise: Tort Law §§ 1.18, 25.3 (2000). A more accurate term for the present theory of such liability might be "custodial liability.” See Rogers v. City of Baton Rouge, 04-1001, p. 5 (La.App. 1st Cir.6/29/05), 916 So.2d 1099, 1102, writ denied, 05-2022 (La.2/3/06), 922 So.2d 1187; Morgan v. City of Baton Rouge, 06-0158, p. 5 n. 1 (La.App. 1st Cir.4/4/07), 960 So.2d 1013, 1016 n. 1, writ denied, 07-1239 (La.9/21/07), 964 So.2d 342.

. The statute has since been amended by Acts 2003, Nos. 725 and 1007, and Acts 2006, No. 545, § 1.

. On that issue, the trial court rejected Mr. Clary’s interpretation of various definitions of “reconstruction” set out in a DOTD plan preparation manual as meeting the requirements of "major reconstruction.” Rather, the trial court's conclusion accorded with a concise definition contained in the Traffic Engineering Handbook published by the Institute of Transportation Engineers, introduced into evidence by the plaintiffs: "Major reconstruction implies substantial changes to the three-dimensional geometric characteristics of the existing roadway.” The same source contrasts such "major reconstruction” with "3R” (resurfacing, restoration, and rehabilitation), where "the fundamental three-dimensional character of the road [is] left intact.” In its reasons, the trial court observed, "Neither project involved any realignment of the road or the establishment of new drainage. The slope of the ditch was not changed, nor was the curvature of the road. The projects were simply resurfacing projects." (Emphasis supplied.)

. Although DOTD sought to exclude introduction of the post-construction standards through a pretrial motion in limine, the trial court opted to defer consideration of that evidentiary issue until the trial on the merits. We perceive no abuse of discretion in that *467 decision, considering that the trial was a bench trial.

. The statute mandates preclusion of such evidence "for any purpose" related to the determination of “whether or not an unreasonably dangerous condition exists" as to "the maintenance, repair, construction, or reconstruction” of the highway. La. R.S. 48:35(F)(2). We agree with the plaintiffs that the duties imposed upon DOTD relating to proper construction or major reconstruction of a highway are separate from its duty to erect signs warning motorists of dangerous conditions on highways.

. A person’s youth or inexperience could properly be considered a mitigating factor in the allocation of fault involving a situation calling for the considered exercise of some skill or experience. See, e.g., Watson, 469 So.2d at 974. But inexperience hardly is relevant where the subject is simple adherence to the elemental driving rule of keeping one’s eyes on the road, to avoid creating an emergency situation through one's own negligence.

. Mr. Hager is left-handed, but plays his guitar in the typical right-handed manner, using his left hand to manipulate and compress the strings.

. Although Dr. Peterson felt it was 'possible” that Mr. Hager’s smoking contributed to the nonunion, he expressed the opinion that "[t]he severity of the injury is the biggest contributing factor,” while "the least contributing factor ... is perhaps that he smoked.” Dr. Hatzis recommended that Mr. Hager quit smoking in an effort to possibly assist the bone healing, but testified that "the main thing that determines what a fracture does is really ... the severity of the initial injury.” Although smoking probably contributed "a little bit” or to "some extent,” according to Dr. Hatzis, he also emphasized that the medical literature showed that "the clavicle is one of those bones where there is a significant rate of non-union.”